**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Grady William POWERS,**
**Defendant–Appellant.**

**No. 93–5944.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 7, 1994.

Decided July 14, 1995.

**ARGUED:** Bruce Alexander Elmore, Jr., Elmore & Elmore, P.A., Asheville, NC, for appellant. Deborah Ann Ausburn, Asst. U.S. Atty., Asheville, NC, for appellee. **ON BRIEF:** Mark T. Calloway, U.S. Atty., Asheville, NC, for appellee.

Before WILKINS and WILLIAMS, Circuit Judges, and LAY, Senior United States Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Affirmed by published opinion. Judge WILLIAMS wrote the majority opinion, in which Judge WILKINS concurred. Senior Judge LAY wrote a separate, dissenting opinion.

## OPINION

WILLIAMS, Circuit Judge:

Grady William Powers appeals his conviction for aggravated sexual abuse of a minor in violation of 18 U.S.C. § 2241(c) (1988).

Powers challenges several of the district court's evidentiary rulings, alleging on appeal that the district court erred in admitting evidence of Powers' prior bad acts, in excluding evidence of the victim's sexual behavior, and in excluding testimony of Powers' expert witnesses. Finding no error, we affirm.

### I.

Powers was accused in 1992 of repeatedly raping his daughter, Brandi Powers, over the course of ten months between November 1989 and September 1990 when she was nine and ten years old. During the time of the alleged rapes, Powers lived with Brandi, her brothers and sisters, and her mother Joyce Powers—now Joyce Powers Gregory (Gregory)—on the Cherokee Indian Reservation in Robbinsville, North Carolina. In November 1989, Powers had returned to his family in Robbinsville after working in Florida. The testimony at trial reflected that Powers repeatedly raped and molested Brandi, often several times a day, and that he would send her brother Brent out of the house so that he could sexually assault her. The record further reflects that, in the fall of 1990, Brandi told her brother Brent that she did not want to be left alone with her father because he had been sexually molesting her. Brent told their mother, who confronted Powers. Powers initially denied Gregory's allegation about the incest, but then admitted to molesting Brandi. Gregory told him to move out of the house. Gregory and Powers were later divorced. Gregory reported the rapes to the authorities in 1992.

Powers was indicted on ten counts of engaging in sexual acts with a person under the age of twelve within the territorial jurisdiction of the United States in violation of 18 U.S.C. § 2241(c).[1] He pled not guilty and went to trial. A jury convicted Powers on all ten counts on September 24, 1993. On January 10, 1994, the district court sentenced Powers to 480 months imprisonment. Powers timely filed a notice of appeal.

---

**1.** 18 U.S.C. § 2241(c) reads:

Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal Prison, knowingly engages in a sexual act with another person who has not attained the age of 12 years, or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both.

## II.

Powers first argues that the district court erred in admitting evidence of his prior bad acts of family violence that he believes were intended to impugn his character under Federal Rule of Evidence 404(b). Powers contends that the district court should have excluded the following evidence of his violence towards his family and, in particular, towards Brandi:[2] Brandi testified that Powers "just got real mean" after they moved to North Carolina and would whip her and his other children with a belt, a hickory stick, or his hands almost every day. (J.A. 19–22.) According to Brandi, Powers whipped his children three or four times a day "for no reason at all" and often left bruises. (J.A. 20–21.) Brandi also testified that Powers hit her mother "[a] lot," (J.A. 38), that he once knocked her brother Brent off the porch with a two-by-four, and after Powers returned to Robbinsville from Florida in late 1989, he continued to whip his children "[a]t least once a day." (J.A. 26.) She further stated that Powers disciplined them by making them eat hot peppers, and he once threatened "to burn the house up" with the children and his wife inside. (J.A. 21–22.) Brent Powers gave similar testimony. Gregory also testified that Powers frequently beat her and their children, and that after Powers returned to Robbinsville in late 1989, "he still whooped the younguns like he always did." (R. 220.)

Rule 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Thus, " 'the prosecution may not introduce evidence of extrinsic offenses to demonstrate the defendant's propensity to commit unlawful acts or to prove that the defendant committed the crime with which he is presently charged.' " *United States v. Percy*, 765 F.2d 1199, 1203 (4th Cir.1985) (quoting *United States v. Davis*, 657 F.2d 637, 639 (4th Cir.1981)). Such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, prepara-

tion, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b).

The list of purposes for which prior bad acts may be admitted under Rule 404(b) is illustrative rather than exclusionary. *Percy*, 765 F.2d at 1203. Consequently, we have construed the exceptions to the inadmissibility of prior bad acts evidence broadly, and characterize Rule 404(b) "as an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *Id.* (emphasis added); *United States v. Russell*, 971 F.2d 1098, 1106 (4th Cir.1992) ("evidence of prior bad acts is admissible unless it is introduced for the sole purpose of proving criminal disposition"), *cert. denied*, —— U.S. ——, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993).

Evidence of prior bad acts is admissible if it is (1) relevant to an issue other than character, (2) necessary to show an essential part of the crime or the context of the crime, and (3) reliable. *United States v. Rawle*, 845 F.2d 1244, 1247 & n. 4 (4th Cir.1988). If these criteria are met, the evidence is admissible unless its "probative value is *substantially* outweighed by its prejudicial effect." *Morgan v. Foretich*, 846 F.2d 941, 944 (4th Cir.1988) (emphasis in original); *Rawle*, 845 F.2d at 1247; Fed.R.Evid. 403. The district court's decision to admit evidence under Rule 404(b) is discretionary, and we will not overturn its decision unless it is "arbitrary or irrational." *United States v. Haney*, 914 F.2d 602, 607 (4th Cir.1990).

We conclude that the evidence of Powers' violence against Brandi and her family members was admissible to explain Brandi's submission to the acts and her delay in reporting the sexual abuse. *See State v. Wilson*, 60 Wash.App. 887, 808 P.2d 754, 757 (physical abuse of victim admissible under state's version of Rule 404(b) in sex abuse case to explain, among other things, the delay in reporting the sexual abuse), *rev. denied*, 117 Wash.2d 1010, 816 P.2d 1224 (1991); *State v. Bates*, 784 P.2d 1126, 1127–28 (Utah 1989) (doctor's testimony as to delays in reporting of abuse admissible under state's version of

---

**2.** The exact sequence of events is unclear from the testimony given at trial; we have attempted, however, to infer from the record the most reasonable order of events as displayed below.

Rule 404(b) where victim testified that her failure to report crime was that she was afraid of defendant).[3]

## A.

■ Applying *Rawle* to this case, we first must consider whether evidence of prior bad acts is relevant to an issue other than character. The threshold for relevancy is relatively low. According to Fed.R.Evid. 401, relevant evidence is that "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, under Rule 404(b), "[i]n order for evidence to be relevant, it must be sufficiently related to the charged offense." *Rawle,* 845 F.2d at 1247 n. 3 (citing *United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984)).

■ The general relevance of this evidence to the sexual abuse is clear to us. Evidence of the beatings of both Brandi and her family provides a cogent explanation for Brandi's failure to report the sexual abuse for almost eighteen months. Thus evidence of the beatings makes it more probable that Brandi failed to report the sexual abuse not because it never took place, but because of

her fear of retribution.[4] Thus, admission of the evidence is relevant to the issue of Powers' guilt.

■ Comparing the general character of physical violence, of the evidence at issue, and of rape, we further conclude that, in this case at least, the beatings were sufficiently related to the nature of the offense charged. In short, rape, as much as any beating suffered by Brandi and her family, is an act of violence. A majority of commentators now recognize the principle that rape is a violent act,[5] and more recently, the North Carolina Supreme Court acknowledged that "[t]he more enlightened view [is] that rape is always a crime of violence, no matter what the circumstances of its commission." *State v. Green,* 336 N.C. 142, 443 S.E.2d 14, 30 (1994) (quoting *United States v. Myers,* 22 M.J. 649, 650 (A.C.M.R.1986), *rev. denied,* 23 M.J. 399 (C.M.A.1987)); *see United States v. Hammond,* 17 M.J. 218, 220 n. 3 (C.M.A.1984) (one of the "common misconceptions about rape is that it is a sexual act rather than an act of violence."). Given the essentially violent character of both rape and physical abuse, we conclude that, for the purposes of this case, the sexual abuse to which Brandi was subjected and the beatings imposed upon

---

3. We have found no federal decisions under Rule 404(b) addressing the admissibility of physical violence against a victim and members of the family in a sexual abuse case. This is presumably due to the relatively narrow federal criminal jurisdiction in such cases. Accordingly, we look to state law for its persuasive force where applicable.

4. *See, e.g., Bates,* 784 P.2d at 1127; *Wilson,* 808 P.2d at 757. In *Bates,* the Utah Supreme Court rejected the defendant's Rule 404(b) objection to admission of evidence that the rape victim (his minor daughter) saw the defendant strike the victim's mother, who was his wife. That court stated "[t]he testimony was not offered to show defendant's propensity for violence, but was elicited to describe the state of the mind of the victim. The victim had testified that the reason she did not report the incidents sooner was that she was afraid of the defendant." *Bates,* 784 P.2d at 1127. Similarly, in *Wilson,* the Washington Court of Appeals allowed evidence of physical assaults against the minor victim which did not occur during the rapes. That court found the assaults were not offered to show the defendant's violent character, but rather were admissible under Rule 404(b) "to explain the delay in

reporting the sexual abuse and to rebut the implication that the molestation did not occur." *Wilson,* 808 P.2d at 757. Both Utah and Washington have adopted the Federal Rules of Evidence for use in their state court systems.

5. Linda Fairstein, *Sexual Violence: Our War Against Rape* 13 (1993) ("There is no doubt that rape and its related violations are crimes of *violence*.") (emphasis in original); 2 Bailey & Rothblatt, *Crimes of Violence: Rape and Other Sex Crimes* (1973); Dorothy E. Roberts, *Rape, Violence, and Women's Autonomy,* 69 Chi.–Kent L.Rev. 359, 359 (1993) (noting traditional view of rape as a crime "centered on violence"); Thomas J. Reed, *Admission of Uncharged Misconduct Evidence in Sex Offender Cases,* 21 Am.J.Crim.L. 127, 154 (1993) ("The number of past violent criminal acts committed by a defendant in a rape case is relevant to proof of guilt because it proves habitual use of violence."); Catherine F. Klein and Leslye E. Orloff, *Providing Legal Protection for Battered Women,* 21 Hofstra L.Rev. 801, 857 (1993) ("Marital rape is an integral part of marital violence."); Janet Aitken, *Rape Prosecutions,* 60 Women L.J. 192, 192 (1974) (classifying rape as a "crime of violence which uses sex as its expression") (citation omitted).

the entire family are sufficiently related to satisfy the requirements of 404(b).

■ Before finishing our consideration of relevance, we pause to discuss one point of disagreement with the dissent: the dissent claims that the beatings were not sufficiently temporally related to satisfy the relevancy requirement under *Rawle*. Dissenting op. at 1476–77. We disagree. The evidence presented at trial clearly showed that Powers' return to Robbinsville predated the sexual abuse by no more than one month. Importantly, Brandi testified that when Powers returned to Robbinsville, he resumed beating the children on a daily basis. (J.A. 26.) Furthermore, Gregory testified that shortly after moving back to Robbinsville, Powers "got [Gregory] and the kids all upstairs, the babies, too", (R. 240), and threatened to burn down their home with Gregory and the children inside. In our opinion, these events, when taken as a whole with the earlier physical mistreatment, show that Powers' abuse that he inflicted upon his family was, in reality, one continuous pattern of activity that existed whenever he was present in the home. Considering that "[t]he impact of the time differential is within the district court's discretion," *United States v. Hadaway*, 681 F.2d 214, 218 (4th Cir.1982), we are especially reluctant to reverse the district court on this ground. The timing of the beatings shows that they constituted yet another expression of the brutality with which Powers dominated Brandi and her family, creating an environment conducive to the further violence of rape. Accordingly, we disagree with the dissent and find that the district court did not abuse its discretion in admitting the evidence as relevant to issues other than Powers' character.

## B.

■ As to *Rawle*'s requirement that the evidence be "necessary," we have made clear that prior bad acts evidence is considered "necessary and admissible [either] where it is an essential part of the crimes on trial, *see United States v. Masters*, 622 F.2d 83, 86 (4th Cir.1980), or where it 'furnishes part of the context of the crime.' *United States v. Smith*, 446 F.2d 200, 204 (4th Cir. 1971)." *Rawle*, 845 F.2d at 1247 n. 4. Here, the evidence of the beatings was necessary to place the sexual abuse evidence in context.[6]

We have approved bad acts evidence to show the context of the crime in many circumstances, often simply to complete the story of the offense. We stated in *Masters* that admission of bad acts evidence is necessary to show the context of the crime when the bad acts are "so intimately connected with and explanatory of the crime charged against the defendant and [are] so much a part of the setting of the case and its environment that [their] proof is appropriate in order to complete the story of the crime on trial by proving the immediate context of the res gestae." 622 F.2d at 86.

Other Circuits have agreed with this approach. For instance, in *United States v. Williford*, 764 F.2d 1493 (11th Cir.1985), the Eleventh Circuit noted that regardless of whether the defendant's intent was at issue, bad acts evidence explaining the context of the crime "is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *Id.* at 1499. Therefore, even though the defendants were charged with sale of marijuana, the district court allowed the government to introduce other evidence that the defendants attempted to negotiate a large purchase of cocaine. In *United States v. Brennan*, 798 F.2d 581 (2nd Cir.1986), the Second Circuit allowed the government to introduce evidence of uncharged incidents of bribery against a judge charged with taking

---

6. We agree with the dissent that this evidence is not necessary or admissible to prove identity, modus operandi, or knowledge. However, simply because evidence might be inadmissible on one ground, it does not follow that the evidence is not admissible under other theories. *See, e.g., United States v. Johnson*, 54 F.3d 1150, 1156 (4th Cir.1995) ("[E]ven if the grounds that the district court gave for admitting the evidence are improper, generally this Court will reverse only if there are no grounds upon which the district court could have properly admitted the evidence."); *United States v. Gallo*, 782 F.2d 1191, 1194 (4th Cir.1986) ("Once admitted, the evidence is deemed admissible on appeal if it is admissible under Rule 404(b) on any theory.").

bribes. In doing so, the court held that "'[o]ther crimes' evidence may be admitted to complete the story of the crimes charged." *Id.* at 589. *See also United States v. Rankin,* 902 F.2d 1344, 1346 (8th Cir.1990) (admitting evidence of concurrent cocaine possession where the defendant was charged with illegal possession of a firearm); *United States v. Currier,* 836 F.2d 11, 17 (1st Cir. 1987) (holding that taped statements of defendant about a drug sale were admissible to show the context of the charged drug distribution offense).

As in the above-cited cases, Powers' acts of violence against Brandi and her family and the violent sexual assaults he committed against his daughter were "so linked together in point of time and circumstances ... that one [could not] be fully shown without proving the other." *Masters,* 622 F.2d at 86. To place the rape in context, the Government elicited testimony from Brandi to show Powers' control over Brandi and the entire family and their inability to resist or report his violent acts. Brandi testified that she did not tell her mother of the sexual assaults for fear of arousing Powers' anger. Indeed, Brandi testified Powers had threatened that if she reported the assaults, "something bad [would] happen to [her]," and everyone, especially she, would "be in trouble." (J.A. 49, 42.) The evidence of Powers' complete control over his family explains Brandi's belief that, as long as Powers lived with the family, it would be futile for Brandi to report the assaults to her mother, who would not have been able to protect her. Thus, having seen the entire context of the crime, the jury could have found more credible Brandi's inability to reject Powers' advances and her explanation that she only told of the assaults when she could no longer face the fear and anxiety of being molested again.

The dissent argues that Brandi's testimony as to Powers' violent acts against his family was relevant solely to the extent that it reinforced Brandi's own credibility. Dissenting op. at 1477. We disagree with the dissent's broad construction of credibility reinforcement, at the expense of evidence properly placing the crime charged in context. Rath-

er, Brandi's testimony of Powers' physical abuse of her and her other family members, and the fear generated by the continuing pattern of abuse, was linked to the effect of those actions: Powers created such fear to insure that Brandi submitted to the violence of his sexual abuse and to prevent Brandi from reporting the crime. The violent acts of physical abuse, when combined with the fear generated by those actions, comprise the factual context of the sexual abuse in this case.

### C.

The "reliable" evidence requirement of *Rawle* need not detain us long. At trial, Brandi, Brent, and Gregory all testified about the beatings, and each of them independently offered similar stories, thereby confirming each others' testimony. Because this eyewitness testimony was sufficient to allow the jury to "reasonably conclude that the act[s] occurred and that the defendant was the actor," the evidence was reliable. *Huddleston v. United States,* 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988).

### D.

Accordingly, the only remaining question is whether the probative value of this prior bad acts evidence was "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. Any prejudicial effect of this evidence "'require[s] exclusion only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.'" *Masters,* 622 F.2d at 87 (quoting Trautman, *Logical or Legal Relevancy—A Conflict in Theory,* 5 Vand.L.Rev. 385, 410 (1951–52)). The evidence here was highly probative. It explained Powers' domination and control over his family, as reflected by Brandi's failure to report the molestation for a significant period of time, and how that domination permitted Powers repeatedly to sexually abuse his daughter.[7] As

---

7. The dissent argues that it was error to allow the Government to introduce this evidence before

to prejudicial effect, we note that cautionary or limiting instructions generally obviate any such prejudice, "particularly if the danger of prejudice is slight in view of the overwhelming evidence of guilt." *Id.* Twice during Brandi's testimony the district court gave the jury limiting instructions on similar acts evidence. These instructions, admittedly, were not a model of clarity, and the dissent asserts that the instructions themselves were error in that they instructed the jury to consider the 404(b) evidence to show "lack of respect." [8]

▉▉▉▉ Powers' counsel, however, did not object to the wording of either of these instructions. The Seventh Circuit confronted a similar situation in *United States v. Herrera-Medina*, 853 F.2d 564 (7th Cir.1988), where the defendant challenged the admission of various audio tapes showing that he was familiar with the routines and practices of a drug conspiracy. After finding a basis in the rules for admitting the evidence, the court turned to the Rule 403 balancing analysis. After noting that the district court instructed the jury not to consider irrelevant portions of the tape, the Seventh Circuit held that

> The efficacy of such instructions may of course be questioned, but as [the defendant's] attorney did not object to the limiting instruction at trial, the only question is whether we can conclude that the instruction *must* have been *so* inefficacious that the judge's failure to exclude the tapes rather than limit the permissible use of them was a plain error; we cannot so conclude.

*Id.* at 566. Consistent with the widely accepted rule that an unobjected-to failure to give a limiting instruction at all is reviewed for plain error, the Seventh Circuit held that a failure to object to the specific wording of limiting instructions is also reviewed for plain error. *Id.* We agree and apply plain error review to the present case. *See also Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) ("It is the rare case in which an improper jury instruction will justify reversal of a criminal conviction when no objection has been made in the trial court."); *United States v. Hegwood*, 977 F.2d 492, 495 (9th Cir.1992) (conducting a plain error review where the defendant did not object to the language of an erroneous initial jury charge), *cert. denied*, —— U.S. ——, 113 S.Ct. 2348, 124 L.Ed.2d 257 (1993). We do not find plain error here, especially considering the district court's final jury instructions.[9]

---

8. For instance, in response to Powers' objection to testimony about the whippings, the district court instructed the jury that

 [A]s we talk about this type of evidence, you will recall what the charges are in the case. Other types of activities which might seem similar or similar type acts are not evidence that the Defendant committed the acts of which he is charged. But if you ultimately find the Defendant did those acts with which he is charged, then you may consider other acts of similar type conduct for the purpose of showing [whether] his method of operation or lack of respect are shown by these types of acts that we're talking about. So that's what we're referring to when we talk about similar type acts. They do not prove that he committed the act with which he was charged, but you may consider them for the purpose of showing his actions and reasons for his actions, or lack of respect, if in fact you find he committed the acts with which he was charged.
 (J.A. 20.)

9. The district court's final charge to the jury stated:

 During the course of this trial, as you know from the instructions I gave you at the time,

Powers attacked Brandi's credibility. Dissenting op. at 26 n. 3. Although this position might be true in other cases, courts have generally relaxed the basic rules for examining witnesses when the witness at issue was a child. *See, e.g., United States v. Nabors*, 762 F.2d 642, 650–51 (8th Cir. 1985) (allowing prosecutor to ask leading questions of a reluctant child witness); *cf. Fields v. Murray*, 49 F.3d 1024, 1036 (4th Cir.1995) (en banc) (noting that a defendant's right to self-representation did not allow him to personally cross-examine eleven year-old through thirteen year-old girls who accused him of sexual molestation for fear of causing the victims "emotional harm"). Here, it was permissible for the district court to allow the Government to ask Brandi about the beatings before Powers had attacked her credibility for two basic reasons: (1) Brandi's testimony as to the delay in reporting was more than just credibility-building, it effectively comprised proof of the context of the crime, *see supra* section IIB; and (2) at the time of trial, Brandi was a child (only in eighth grade) testifying against her father. The district court did not abuse its discretion in allowing the Government to ask Brandi about the acts in the least intrusive way possible.

The district court adequately instructed the jury that it could only use the prior bad acts evidence to establish intent and state of mind if it initially found, beyond a reasonable doubt, that the other evidence presented established that Powers committed the acts charged. *United States v. Menzer*, 29 F.3d 1223, 1234 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 515, 130 L.Ed.2d 422 (1994) (district court properly instructed jury as to consideration of Rule 404(b) evidence by instructing jury it was not to consider evidence for any other purpose than motive, intent, knowledge, and absence of mistake); *cf. United States v. Owen*, 15 F.3d 1528, 1537–38 (10th Cir.1994) (any error committed by district court in giving cautionary instructions during reception of 404(b) evidence as to proper basis for admissibility was corrected by later accurate limiting instruction and by proper final jury instruction). The final jury instruction—although it did not specifically instruct the jury to consider the evidence for the purpose for which we uphold its admission today, its context—did caution the jury not to consider the evidence for purposes of proving character, and proffered only permissible uses of character evidence (intent and state of mind) for the jury's consideration. Accordingly, we conclude that the district court did not abuse its discretion in determining that the probative value of the prior bad acts evidence more than substantially outweighed any danger of unfair prejudice.

testimony or evidence was received with respect to alleged similar acts of the Defendant. Such evidence that an act is done at one time or on one occasion is not any evidence of proof that a similar act was done at another time or on another occasion.... If the jury should find beyond a reasonable doubt from other evidence in the case that the defendant did the act charged in the indictment, then the Jury may consider evidence as to an alleged act of any like nature in determining the state of mind or intent with which the accused did the act charged in the indictment.
(J.A. 177–78.)

The dissent argues that *United States v. Varner*, 748 F.2d 925, 927 (4th Cir.1984), requires us to reverse a conviction whenever two instructions to the jury conflict. Dissenting op. at 1476 n. 4. In our opinion, however, *Varner* is easily distinguishable. *Varner* confronted a situation in which the district court gave conflicting and erroneous *final instructions* to the jury. We appropriately held that the conviction must be re-

### E.

In this case, the district court's evidentiary ruling is admittedly a close question, and pushes the boundaries of Rule 404(b); however, we cannot say that the district court's actions were beyond the scope of its discretion. "A district court's evidentiary rulings are entitled to substantial deference, because a district court is much closer than a court of appeals to the pulse of the trial." *Russell*, 971 F.2d at 1104 (citations and internal quotation marks omitted). Therefore, because the evidence was relevant to issues other than Powers' character, was reliable and necessary, and was more probative than prejudicial, we find that the district court did not abuse its "wide discretion," *id.* at 1105, in admitting the evidence of Powers' acts of violence against his family and his daughter.

### III.

■■■ Next, Powers argues that the district court's exclusion of evidence regarding Brandi's sexual relations with a boyfriend, which occurred over a year after the alleged rapes, violated his Sixth Amendment right to cross-examine and confront witnesses and his due process rights under the Fifth Amendment to present evidence relevant to his defense. Thus, Powers contends that the evidence should have been admitted under Fed.R.Evid. 412(b)(1).[10]

versed because the jury "might have followed the erroneous instruction," and, therefore, its verdict might have been based on impermissible considerations. Here, however, we confront no such problem. When a limiting instruction conflicts with a final jury instruction, it is clear that the final instruction trumps any previous ones. *See Hegwood*, 977 F.2d at 495 (holding that an erroneous initial charge to the jury was rendered harmless by a correct final charge); *cf. United States v. Hanley*, 974 F.2d 14, 18 (4th Cir.1992) (holding that an incorrect final instruction on the jury's duty regarding guilt was fixed by other correct instructions in the same charge). Otherwise, the district court would have no ability to correct erroneous limiting instructions, and any error would require a reversal.

**10.** Rule 412 was amended effective December 1, 1994, and governs in all proceedings then pending "insofar as just and practicable." Order of the Supreme Court of the United States adopting

Specifically, Powers argues that the Government's evidence implied that, because of her young age, Brandi's sexual activity could only be explained by Powers' sexual assaults against her. Thus, he contends that evidence of Brandi's sexual relations with her boyfriend should have been admitted to rebut this inference. He relies primarily on *United States v. Bear Stops*, 997 F.2d 451, 455–57 (8th Cir.1993), in which evidence that the victim was sexually assaulted by three other boys was constitutionally required to be admitted because these assaults occurred at about the same time as the defendant's sexual assault, and thus potentially provided an alternative explanation to the defendant's guilt.[11] Brandi's sexual relations with her boyfriend, however, occurred long after the acts for which Powers was tried, and thus this evidence was irrelevant because it could not provide a reasonable alternative explanation to Powers' guilt.[12] *See United States v. Torres*, 937 F.2d 1469, 1473 (9th Cir.1991) (evidence of victim's sexual activity six months after assault was inadmissible as irrelevant), *cert. denied*, 502 U.S. 1037, 112 S.Ct. 886, 116 L.Ed.2d 789 (1992). "'The Sixth Amendment right to confrontation and the Fifth Amendment right to due process of law require only that the accused be permitted to introduce all *relevant* and admissible evidence.'" *Bear Stops*, 997 F.2d at 454 (emphasis added) (quoting *United States v. Kasto*, 584 F.2d 268, 272 (8th Cir.1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979)). A defendant's Sixth Amendment right to cross-examination is limited to issues that are relevant to his trial, and the district court has broad discretion to determine which issues are relevant. *See United States v. Greenwood*, 796 F.2d 49, 54 (4th Cir.1986). Because the district court correctly determined that evidence of Brandi's relations with her boyfriend was not relevant to issues at trial, it did not abuse its discretion in excluding this evidence.

## IV.

Finally, Powers argues that the district court erred in excluding testimony of two experts who would have testified that Powers did not exhibit the characteristics of a fixated pedophile. Expert testimony explaining scientific evidence is admissible under Fed.R.Evid. 702 if it will assist the jury "to understand the evidence or determine a fact in issue." When determining admissibility under Rule 702, a trial judge must ensure that all scientific testimony or evidence admitted is both relevant and reliable, and that its evidentiary reliability is based upon scientific validity. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. —— at —— & n. 9, 113 S.Ct. 2786 at 2795 & n. 9, 125 L.Ed.2d 469 (1993). As we recently noted:

> [T]he *Daubert* Court set forth a two-part test which must be met in order for such expert testimony to be properly admitted under the FRE: (1) the expert testimony must consist of "scientific knowledge"— that is, the testimony must be supported by appropriate validation; *and* (2) the evidence or testimony must "assist the trier

and amending Fed.R.Evid. 412, Apr. 29, 1994, *reprinted in West's Federal Criminal Code and Rules* at 10 (Supp.1994). The rule was revised primarily to diminish confusion engendered by the language of the original rule and to "expand the protection afforded alleged victims of sexual misconduct." Fed.R.Evid. 412 advisory committee's note (1994). The language of the former rule, which was applied at trial, prohibited exclusion of evidence "constitutionally required to be admitted." Fed.R.Evid. 412(b)(1) (1993). The amended rule allows admission of "evidence the exclusion of which would violate the constitutional rights of the defendant." Fed.R.Evid. 412(b)(1)(C) (1994). Although the former rule was in effect during Powers' trial, the revisions in the amended rule do not affect our analysis of whether the exclusion of evidence violated Powers' constitutional rights.

11. Most of the other cases relied on by Powers involved evidence of incidents which occurred prior to the alleged assaults. The courts in those cases generally based admission under Rule 412 on the ground that the incidents tended to provide an alternative explanation to the conclusion that the defendant was the perpetrator of the sexual abuse. *See, e.g., United States v. Begay*, 937 F.2d 515, 519–21 (10th Cir.1991) (evidence of sexual assault prior to defendant's alleged assault).

12. The Government presented no medical evidence of injury, enlarged hymen, or loss of virginity, thus there was nothing to be rebutted by evidence of Brandi's subsequent sexual relations with her boyfriend.

of fact to understand the evidence or to determine a fact in issue."

*United States v. Dorsey,* 45 F.3d 809, 813 (4th Cir.1995) (quoting *Daubert,* — U.S. at ——, 113 S.Ct. at 2795). We review the district court's refusal to admit scientific evidence for abuse of discretion. *Dorsey,* 45 F.3d at 814 ("[U]nder the *Daubert* analysis, a trial judge has a great deal of discretion in deciding whether to admit or exclude expert testimony."); *United States v. Bynum,* 3 F.3d 769, 773 (4th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1105, 127 L.Ed.2d 416 (1994).

### A.

 The first question we must confront is whether the results of a penile plethysmograph test meet the scientific validity prong of *Daubert.* Specifically, Powers argues that the district court erred in excluding the testimony of a clinical psychologist who would have testified that the results of a penile plethysmograph test did not indicate that Powers exhibited pedophilic characteristics. The penile plethysmograph, or arousal, test measured Powers' sexual arousal in response to pictures of nude females of various age groups. The district court excluded this evidence because, in its opinion, the test did not satisfy the "scientific validity" prong of *Daubert.*

 In *Dorsey,* we enumerated the factors that the Supreme Court directed trial courts to consider when evaluating the scientific validity of proposed evidence:

(1) Whether the theory or technique used by the expert can be, and has been, tested;

(2) Whether the theory or technique has been subjected to peer review and publication;

(3) The known or potential rate of error of the method used; and

(4) The degree of the method's or conclusion's acceptance within the relevant scientific community.

*Dorsey,* 45 F.3d at 813 (discussing *Daubert,* — U.S. at —— ——, 113 S.Ct. at 2796–97).

The evidence produced at trial clearly showed that these factors weighed against the admission of the penile plethysmograph test results. First, the Government proffered evidence that the scientific literature addressing penile plethysmography does not regard the test as a valid diagnostic tool because, although useful for treatment of sex offenders, it has no accepted standards in the scientific community.[13] Second, the Government also introduced evidence before the judge that a vast majority of incest offenders who do not admit their guilt, such as Powers, show a normal reaction to the test. The Government argues that such false negatives render the test unreliable. Powers failed to introduce any indicia, let alone a sufficient level, of reliability to rebut the Government's evidence. Accordingly, in light of extensive, unanswered evidence weighing against the scientific validity of the penile plethysmograph test, we cannot say that the district court abused its discretion.

### B.

 Next, Powers argues that the district court abused its discretion in excluding the testimony of Dr. Anthony Sciara. Dr. Sciara would have testified that Powers did not demonstrate the psychological profile of a fixated pedophile. The district court ruled that Powers failed to establish either the relevance or the scientific validity of psychological profiling as applied to the facts at issue. The arguments on appeal, however, focus our attention on the second prong of *Daubert,* namely, whether the evidence is "relevant" to the issue under consideration.

Once again, *Dorsey* provides the analytical framework for our analysis:

In determining whether the evidence meets the second prong of the two part test—that is, whether the evidence will be

---

13. Powers has not provided, nor have we found, any decisions acknowledging the validity of the use of penile plethysmography other than in the treatment and monitoring of sex offenders. *See, e.g., State v. Emery,* 156 Vt. 364, 593 A.2d 77 (1991) (validity of penile plethysmography as part of offender's treatment); *Walrath v. United States,* 842 F.Supp. 299 (N.D.Ill.1993) (monitoring by penile plethysmograph as valid condition for parole), *aff'd,* 35 F.3d 277 (7th Cir.1994).

helpful to the trier of fact—the Supreme Court warned that throughout an admissibility determination, a judge must be mindful of other evidentiary rules, such as FRE 403, which permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." [*Daubert*], —— U.S. at ——, 113 S.Ct. at 2798.

\* \* \*

[The *Daubert* ] Court concluded:

> Conjectures that are probably wrong are of little use ... in the project of reaching a quick, final, and binding legal judgment—often of great consequence—about a particular set of events in the past. We recognize that in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by the Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.

*Id.* at —— – ——, 113 S.Ct. at 2798–99. *Dorsey,* 45 F.3d at 813–14.

Powers argues that Dr. Sciara's psychological profile of him meets the relevancy criteria due to the direct relationship between the subject matter of the test and the crime charged. Counsel for Powers proffered the following evidence concerning Dr. Sciara's psychological profile. Based on numerous interviews with child sex abusers and other research, Dr. Sciara has created a profile of the common characteristics of incest abusers. According to Sciara, the largest common denominator among incest abusers is that forty percent of the time they exhibit the characteristics of fixated pedophiles. Powers' tests, however, revealed that he did not share this characteristic. From this data, Powers argues that "[t]his testimony was clearly relevant for the purpose of demonstrating that [he] was psychologically unlikely to have committed the alleged crimes charged against him." *Brief for the Appellant* at 19. We disagree.

The difficulty with Powers' argument is that he fails to provide a substantial link between the expert testimony and his theory of defense. At most, this evidence would have shown only that Powers did not belong to a group that comprised forty percent of incest abusers. Powers, however, was charged with statutory rape of his daughter—incest abuse—not with being a fixated pedophile. To be relevant, this testimony must show, in a very real way, that *because* Powers did not share a characteristic common to a large minority of incest perpetrators, he was less likely to be an incest perpetrator himself. The district court clearly understood this fundamental flaw when the testimony was proffered:

> THE COURT: [L]et's say that we did allow [Dr. Sciara] now to testify [without basing his opinion on the results of the penile plethysmography test]. And all he's going to say is that this is not the kind of man who has a fixation on children.
>
> [DEFENSE COUNSEL]: Correct, Your Honor.
>
> THE COURT: What does that tell us?
>
> [DEFENSE COUNSEL]: Judge, I don't think it is end all and be all of our defense. I think it's an important piece of evidence for the jury to have.
>
> THE COURT: Why? ... [The Court questioned Defense Counsel about whether this evidence would really make it more likely than not that Powers did not commit the offense.]
>
> [DEFENSE COUNSEL]: ... I don't think there's any question that some people that aren't fixated pedophiles commit incest. But I think it would be a substantial percentage and I think it is information that is relevant.

(J.A. 174.) If Powers had offered supporting evidence showing that those who are not fixated pedophiles are less likely to commit incest abuse (the crime with which Powers was charged), Dr. Sciara's testimony might have been relevant. However, Powers offered no evidence to link a non-proclivity for pedophilia with a non-proclivity for incest abuse, even after the district court gave Powers ample opportunity to introduce evidence

showing the relevance of Dr. Sciara's testimony.[14] Accordingly, we find that the district court did not abuse its discretion in excluding this evidence because Powers failed to prove either its relevancy or "a valid scientific connection to the pertinent inquiry" of whether he committed incest. *Daubert*, —— U.S. at ——, 113 S.Ct. at 2796.

## V.

For the reasons stated above, we affirm the judgment of the district court.

*AFFIRMED.*

LAY, Senior Circuit Judge, dissenting:

Powers was indicted on ten counts under 18 U.S.C. § 2241(c) of knowingly engaging in, or attempting to engage in, a sexual act with another person (his daughter) who had not attained the age of twelve years. *Over proper objection,* the district court permitted the prosecution to open its case-in-chief with extensive testimony detailing the defendant's whipping and physical beating of his daughter, Brandi, who was the victim of the sexual assaults; her brother; and the defendant's wife, the mother of the two children. Powers was not charged with any of these physical beatings. This evidence was not similar in nature or in any way related to the crime charged.

Brandi testified that the beatings commenced when she was seven and a half years old, more than two years before the sexual assaults for which Powers was charged. J.A. 20. The following is a portion of Brandi's extensive testimony concerning the physical abuse Powers inflicted on her and her brother:

W: Well after we come back I was about seven and a half, or something like that he started whipping us. He would whip us all the time for no reason at all. And he—well, I can't really say how many times—whipped for nothing. He would whip us like three or four times a day.

\* \* \*

Q: You said he whipped you all the time. What did he use?

A: Sometimes he would use a belt. Sometimes he would use a belt [a]nd something like, he used a hickory or his hands.

Q: Okay. Did it leave bruises?

A: Yeah, most of the time.

Q: All right. Did he ever give any reason for it?

A: Well, he'd like—he made us clean the house and pick up the trash in the yard every day. And every day, you know, we would try to do what he told us, but there was always something not good enough, I guess. Sometimes we would have to do it over and I don't know—he would whip us.

\* \* \*

Q: Did he ever hit you or your brother with anything else?

A: One time he knocked my brother off the porch with a two by four.

Q: Can you remember how old your brother was when that happened?

**14.** The transcript reflects the following conversations between the district court and counsel:

THE COURT: All right. I will give you an opportunity to see if you can get [Dr. Sciara]. I want you to get some lunch, but if you can get him and find out what he would say, the reduction of chances of this happening to someone who does not meet the profile as opposed to someone who does.

\* \* \*

(Whereupon the Court reconvened and the following proceedings were had:)

Were you able to get any additional information at lunch?

[DEFENSE COUNSEL]: Your Honor, I was not able to get in touch with Dr. Sciara. It is my understanding that he is out and will be back in his office at 3:00 [p.m.].

\* \* \*

THE COURT: . . . I am going to rule that there is no showing of a sufficient basis of a standard by which the information is gained to establish its validity. And secondly, that even if this could be established . . . that it would not be material to what we are looking for in this case and what the issue in this case is.

I am going to still give you an opportunity to bring to my attention anything additionally which you want to because I want you to be protected completely on the record with everything that you want.

(J.A. 174–76.)

A: He was maybe seven. I'm not sure.

Q: Was there ever anything else your dad did?

A: He would whip us all of the time.

Q: Okay. What about, you mentioned do [sic] anything to discipline you? Do you remember—

A: Well, he—one time he told us if we didn't start listening to him and doing what he said, that he would make us eat peppers, these peppers, hot peppers and make us eat them.

Q: Where did he get the hot peppers?

A: At the grocery store or produce store or something.

\* \* \*

Q: Okay. Did that make you sick?

A: Yes.

Q: Did you throw up?

A: Yeah, one time.

Q: Okay. How bad did you throw up?

A: I just threw up and it was just like water and blood or something.

J.A. at 20–22.

As the transcript makes clear, the prosecutor made every effort to elicit graphic details of the physical abuse from Brandi. It is difficult to comprehend what purpose the prosecutor could have had for doing so except to inflame the passions of the jury by conjuring up disturbing images of child and spousal abuse, thereby emphasizing that the defendant was a mean, cruel, and violent man.[1]

The district court, on two occasions, in overruling the defendant's objections, erroneously and prejudicially instructed the jury, in direct violation of Fed.R.Evid. 404(b), that it could consider the evidence to show Powers' "LACK OF RESPECT." This language instructed the jury to consider the evidence to show bad character. As the majority concedes, this is expressly impermissible under Rule 404(b).

In the same limiting instruction, the district court instructed the jury that the bad acts evidence could be used to demonstrate Powers' method of operation or modus operandi. J.A. 20. As the majority concedes, the evidence was not admissible for that purpose.[2] The majority also concedes the evidence was not relevant to Powers' knowledge, as the district court erroneously instructed the jury in its final charge.

The court's final instruction stated:

> Such evidence that an act is done at one time or on one occasion is not any evidence of proof [whatsoever] that a similar act was done at another time or on another occasion. . . . If the Jury should find beyond a reasonable doubt from other evidence in the case that the defendant did the act charged in the indictment, then the Jury may consider evidence as to an alleged act of any like nature in determining the state of mind or intent with which the accused did the act charged in the indictment.

J.A. 177–78. Under the circumstances of this case, "state of mind or intent" can only refer to whether Powers "knowingly" engaged in and attempted to engage in a sexual act with a female who had not attained the age of twelve years. J.A. 178. The court instructed the jury that "knowingly" meant that "the act was done voluntarily and intentionally and not because of mistake or accident." Trial Transcript at 425. Prior physi-

---

1. The Supreme Court has noted the dangers inherent in the admission of evidence of prior bad acts. These dangers include the risk that the jury will convict the defendant because his criminal disposition makes it more likely he committed the crime on trial, or because the defendant is a bad person deserving of punishment, whether or not he committed the charged crime. *See, e.g., Huddleston v. United States*, 485 U.S. 681, 686, 108 S.Ct. 1496, 1499–1500, 99 L.Ed.2d 771 (1988); *Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 218–19, 93 L.Ed. 168 (1948); *see also United States v. Moccia*, 681 F.2d 61, 63 (1st Cir.1982).

2. Rule 404(b) evidence may be admitted to show modus operandi when the *identity* of the defendant is in question. Thus, prior bad acts indicating a modus operandi are admissible when those acts are "so nearly identical in method as to earmark them as the handiwork of the accused." *McCormick's on Evidence*, § 190, at 801 (4th ed. 1992). The testimony was not admissible for that purpose here because, even if the identity of the defendant were in question, prior physical abuse of the daughter, son, or mother is certainly not so nearly "identical" to the rapes of the daughter that it is relevant to show that only Powers could have committed those crimes.

cal beatings of Brandi, her brother, and her mother are in no way relevant to show Powers was aware of his action when he sexually abused Brandi and that he did not act as the result of a mistake. The fact that Powers physically beat and whipped his children and wife simply does not make it any more or less likely that he acted *knowingly* in sexually abusing his daughter.

The majority seeks to overcome the obvious prejudice of this evidence in a number of ways. First, it urges that notwithstanding the error of these limiting instructions, the evidence was otherwise admissible for reasons not relied on by the district court in instructing the jury. The majority opinion finds the evidence admissible to bolster the credibility of the victim, Brandi, by explaining her delay in reporting the crime. In addition, it finds the testimony necessary to show the context of the crime. Finally, it urges that there was no objection to the court's admittedly erroneous limiting instructions.

I must respectfully dissent. Such hindsight rationalization cannot erase the prejudicial harm created at this trial.

## BRANDI'S CREDIBILITY

The government *opened* its case-in-chief by producing evidence of *physical abuse* not only against the alleged victim, but also against her brother and mother.[3] The majority finds this evidence admissible to explain the delay in reporting the abuse, thus bolstering Brandi's credibility. The court at no time instructed the jury to use the evidence for that purpose.

Furthermore, the court instructed the jury that it must find Powers sexually abused Brandi *before* it could consider the Rule 404(b) evidence. This would require that the jury already have believed Brandi's testimony, negating the need for an explanation of why she did not come forward sooner. By repeatedly instructing the jury that it could not consider the Rule 404(b) evidence to show Powers committed the acts charged in the indictment, the trial judge in effect *precluded* the jury from using the evidence to conclude that "Brandi failed to report the sexual abuse not because it never took place, but because of her fear of retribution," the purpose for which the majority finds the testimony relevant. *See* supra at 1465.

The majority concludes this Court may affirm the admission of Rule 404(b) evidence for any proper purpose on appeal regardless of the instructions given at trial. *See* supra at 1465 n. 5. It is simply unrealistic to expect that when the jury is erroneously instructed as to how it should consider the evidence, it will somehow nevertheless use the evidence for another unexplained but proper reason. Under this theory, we reduce specific jury instructions used to guide the jurors' consideration of the evidence in a given case to a meaningless exercise of judicial rhetoric. This Court should not ignore the actual instructions the district court gave the jury, and the effect that those instructions must have had on the jury's consideration of the evidence. That is especially true when, as in this case, the district court twice instructed the jury to consider the evidence to show a negative character trait of the accused. In order to affirm the conviction, it is necessary to ignore the theory on which

3. By offering this evidence at the commencement of its case-in-chief to explain the delay, the government breaches the "time-honored principle" that "in the absence of an attack upon credibility no sustaining evidence is allowed." *United States v. Bolick*, 917 F.2d 135, 138 (4th Cir.1990) (quoting *McCormick on Evidence*, § 49, at 115 (3d ed. 1984)). The introduction of this evidence to explain the delay and thus bolster Brandi's credibility eviscerates that principle and permits the government to anticipate how the defendant might impeach its witnesses, and on that basis inject at the commencement of its case-in-chief highly prejudicial testimony detailing prior bad acts. *See State v. Werner*, 302 Md. 550, 489 A.2d 1119, 1125–26 (1985) (finding bad-acts evidence

offered to explain a delay in reporting sexual abuse "inadmissible evidence as part of the State's case in chief" because "[t]he State itself, by this 'bootstrap' operation, created the alleged need for presenting evidence of other crimes by the defendant"). Indeed, in this case, the testimony concerning Powers' physical abuse was the first testimony the jury heard, before any evidence Powers had committed the crimes with which he was charged. Moreover, even assuming it may be within the district court's discretion to deviate from this principle on occasion as the majority suggests, the district court did not exercise that discretion here because it did not admit the evidence for that purpose.

the case was presented to the jury and fictionalize that, notwithstanding the erroneous instructions as to the relevancy of the evidence, the jurors somehow, some way, would know that there was another legal theory under which obviously prejudicial evidence should be considered. "Our theory of trial relies upon the ability of a jury to follow instructions." *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954). To suggest that the jury could consider the evidence to bolster Brandi's credibility is simply a post hoc rationalization. To sustain a criminal conviction on such grounds denigrates the trial process to a meaningless exercise of legal theory and constitutes a clear denial of due process.

Moreover, I cannot agree with the majority that the final instruction to the jury somehow cured or mitigated the error in the previous instructions. The jury was expressly told *at the time the evidence was admitted* that they were to consider it to show Powers' "lack of respect." The final instruction did not cure this error, but merely added yet another erroneous reason for the admission of the testimony, leaving "lack of respect" as one of the several improper purposes for which the jury could consider the evidence.[4]

Nor do I find convincing the majority's argument that defense counsel failed to object to the erroneous limiting instructions. I respectfully submit, in light of the overall record, prejudice in this criminal trial cannot be so easily obviated. Here, the defendant initially objected to the admissibility of the evidence. The court overruled the objections by allowing the evidence for "limited" pur-

poses. Those purposes, as the majority concedes, were wrong. Counsel then stipulated with the court that he would no longer make objection if it could be understood his objection would carry forward as to all bad-act evidence. J.A. 33. The court agreed and said that whenever necessary, it would give a limiting instruction.[5] The court, in disclosing the reason for which it was allowing the jury to consider the evidence, was simply telling the jury why it was overruling the objection. Surely the defendant should not have to make a repetitive objection to the evidence based on the court's erroneous reasoning. The trial court erred when it overruled the objection. Its incorrect reason simply amplified the prejudicial error. Certainly defense counsel should not have to do anything more than he did here.

## CONTEXT OF THE CRIME

The second ground on which the majority justifies the admissibility of Powers' acts of physical abuse against Brandi, Brent, and their mother is that they were necessary to put Powers' crime in context. Brandi testified that the beatings commenced when she was seven and a half years old, more than two years before the sexual assaults for which Powers was charged. She stated these beatings stopped after her mother left home.[6] J.A. 20. Brandi testified that her brother was hit by her father with a board when the brother was seven. J.A. 21. The exact date this occurred is not known. Finally, Brandi testified that the beatings of her mother occurred before the family left South Carolina in late 1987, two years before

---

4. This Circuit has previously held, with respect to the final charge to the jury, that "[w]here two instructions are in conflict, and one is an incorrect statement of the law and is clearly prejudicial, the charge constitutes reversible error, since the jury 'might have followed the erroneous instruction.'" *United States v. Varner,* 748 F.2d 925, 927 (4th Cir.1984) (quoting *United States v. Walker,* 677 F.2d 1014, 1016–17 n. 3 (4th Cir. 1982)). In the instant case, the instructions given during the course of the trial were all erroneous, one was clearly prejudicial, and the jury was never told to disregard that instruction.

5. The Court stated as follows:
 I will not require you to object each time. But if you feel the time has come that you need

another limiting instruction, give me an objection to it. *I'm going to let it stand as I've already instructed the jury.* If you come to the time that you think they may not be remembering that anymore, you object and I'll give them that limiting instruction again.
 J.A. 33–34 (emphasis added).

6. There is evidence that Powers' wife left home after fighting with Powers and went to her grandmother's house for unknown periods of time. Trial Transcript at 221–22. Although the record does not reveal the exact date, Brandi testified that this occurred immediately before the first sexual assault in Robbinsville. J.A. 27.

the sexual assaults.[7] Thus, the physical abuse of Brandi, let alone of her mother and brother, *did not occur in conjunction with the incidents of statutory rape.* I find utterly unconvincing the majority's assertion that these incidents are "so linked in point of time and circumstance" to the statutory rapes that proof of the statutory rapes occurring from late 1989 to the fall of 1990 could not be fully shown without evidence of the physical abuse.[8]

In all of the cases cited by the majority, the evidence was inextricably intertwined with the charged offense such that the story of the charged crime could not be told without that evidence.[9] It is a complete non sequitur to suggest that the jury had to hear about every incident of violence occurring within this family for the preceding several years in order to complete the account of the statutory rapes. The majority nevertheless finds this evidence necessary to show the context of the crime for the very same reason it finds the testimony relevant, i.e., because it shows why Brandi did not report the sexual abuse. *See* supra at 1467. Thus, the majority's claim that this is evidence related to the context of the crime is simply repetitive of its credibility argument, which, as discussed, cannot logically be made on this record.[10]

7. Brandi testified that she never saw her father hit her mother after they left South Carolina. J.A. at 39, 71. Later testimony established that the family left South Carolina in late 1987, and the statutory rapes did not occur until late 1989. Trial Transcript at 356. The testimony regarding spousal abuse was as follows:

Q: Did you ever see your dad hit your mom?
A: Yes.
Q: What did he hit her with? Did he hit her with anything he could find?
A: He just hit her.
Q: How many times did you see that?
A: A lot.
Q: Did he ever leave bruises?
A: No. Unless around her butt, or something like that.
Q: Okay. Did you ever see any bruises around her eyes?
A: I don't think so. I can't remember.

J.A. 38.

8. The "context of the crime" language has its genesis in *United States v. Smith,* 446 F.2d 200, 204 (4th Cir.1971). In that case, this Court upheld the admission of evidence concerning a "postal money order which had been stolen from the *same envelope* and negotiated on the *same day* as the [stolen] postal money order specified in the federal indictment." *Id.* (emphasis original). The evidence was thus admitted because it showed the defendant had possession of the stolen money order for which he was charged and knew that it was stolen and also because it "furnish[ed] part of the context of the crime." *Id.* Even when the bad-acts evidence is immediately temporally related to the charged crime as was the case in *Smith,* however, it is only part of the context of the crime when it is necessary to explain the charged offense. *See United States v. Swiatek,* 819 F.2d 721, 726–27 (7th Cir.) (finding evidence that the defendant stole a car *on the same day* that he committed the crime charged was not admissible as background evidence because "evidence of this incident could have been excluded without damage to the jury's understanding" of the underlying offense), *cert. denied,*

484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987).

9. For example, in *United States v. Masters,* 622 F.2d 83 (4th Cir.1980), a case relied upon by the majority, Masters was charged with illegal firearms sales. The Government's evidence included tape recorded conversations during which Masters agreed to sell the firearms, and also made reference to his probationary status and to prior bad acts he had committed. The district court refused to suppress portions of the tape in which Masters made reference to prior bad acts because it found it "impossible to do so without impairing the intelligibility of the conversations themselves." *Id.* at 85. Similarly, in *United States v. Williford,* 764 F.2d 1493, 1499 (11th Cir.1985), the uncharged drug transactions were admissible because they occurred within the same time frame as the conspiracy charged in the indictment and arose from the same series of transactions as the charged conduct. In *United States v. Brennan,* 798 F.2d 581, 589–90 (2d Cir.1986), evidence of prior incidents of bribery explained how the relationship between two key witnesses developed. The court found that without this evidence, "the jury would have had a truncated and possibly confusing view of the respective roles played by [the two witnesses] and of the basis for the trust between [them]." *Id.* at 590.

10. The majority also repeatedly refers to this evidence as admissible to show Powers' "control over his family" and to "explain Brandi's submission to the acts." *See* supra at 1467, 1465. As the majority notes, in order to be relevant, evidence must tend to "make the existence of any *fact that is of consequence to the determination of the action* more probable or less probable...." Fed.R.Evid. 401 (emphasis added). Why Brandi submitted to these acts is simply not material in a prosecution for statutory rape. Even if Brandi had consented, Powers would still be guilty. Control is therefore of no consequence in this case, and this evidence cannot be admitted for that purpose.

*PREJUDICIAL EFFECT*

Finally, I cannot agree with the majority's conclusion that the probative value of this evidence is not substantially outweighed by its prejudicial effect. The limiting instructions make clear the court did not admit the testimony to bolster Brandi's credibility. Because the district court did not understand the purported relevance of the testimony, it could not have properly weighed the probative value of the evidence in relation to its prejudicial effect. The only possible probative value of this evidence would be to rehabilitate an unimpeached witness. Its probative value is therefore extremely slight. If the district court had weighed that value against the prejudicial nature of the testimony, especially in light of its placement at the very commencement of the prosecutor's case-in-chief and the amount of detail elicited by the prosecutor, it is difficult to believe the court would have admitted the testimony for that purpose.

The majority concludes the testimony is more probative than prejudicial because the district court issued a series of limiting instructions and because the "danger of prejudice is slight in view of the overwhelming evidence of guilt." I cannot agree. First, as previously discussed, each of the limiting instructions issued by the district court was erroneous. In addition, the first limiting instruction clearly compounded the prejudicial effect of the evidence by twice telling the jury the evidence could be considered to show Powers' lack of respect, hardly an element of proof for statutory rape. Even assuming this instruction was not plain error, it does not follow that the limiting instructions *obviated* the prejudice that resulted from the admission of this evidence.[11]

Moreover, in this case, it certainly cannot be argued that there was overwhelming evidence of Powers' guilt. Indeed, the prosecutor's case essentially consists of Brandi's testimony and evidence that Brandi went into a dissociative state during a gynecological exam. No physical evidence of sexual abuse was introduced by the prosecution. The case against Powers therefore turned on the jury's consideration of testimony from Brandi and Powers, both of whom testified at trial.

*CONCLUSION*

It is difficult to conceive what possible reason the prosecutor had for eliciting details from Brandi concerning Powers' physical beatings of his wife and children at the commencement of its case-in-chief except to paint Powers as a bad person and prejudice the jury against him. The instructions compounded that prejudice by directing the jury to consider the testimony to demonstrate Powers' bad character. On that basis, any tangential probative value this evidence may have for any purpose was substantially outweighed by its prejudicial effect.

In addition, because this was the first testimony the jury heard, before any testimony regarding the acts charged in the indictment, it is highly probable the jury was influenced by it. As previously discussed, it also cannot be argued that there was other overwhelming evidence of Powers' guilt.

It is true the defendant is not entitled to a perfect trial, but he is entitled to a fair trial. Powers did not receive a fair trial. For the foregoing reasons, I respectfully dissent.

11. *See United States v. Cortijo–Diaz*, 875 F.2d 13, 15–16 (1st Cir.1989). In *Cortijo–Diaz*, the First Circuit found the Rule 404(b) evidence that the district court had admitted was not relevant to the defendant's guilt. The court determined that the limiting instruction given by the court, "which consisted of a laundry-list of permitted uses contained in the rule, was simply incapable of limiting the damage caused by this evidence." *Id.* "[W]ithout further explanation by the trial judge, 'the instruction must have left the jury wondering how the [criminal record] could have a bearing on the' various items of Rule 404(b)." *Id.* at 16 (quoting from Appellant's brief). Similarly, in *United States v. Mothershed*, 859 F.2d 585, 591–92 (8th Cir.1988), the court found the limiting instructions incapable of dispelling the prejudice of improperly admitted Rule 404(b) evidence because the "instructions had the effect not of preventing the jury from using the evidence for improper purposes, but of directing the jury to consider the evidence for improper purposes."