UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

Nos. 98-5(L)
(CR-97-2-P)

_____

United States of America,

Plaintiff - Appellee,

versus

Aquilia Marcivicci Barnette,

Defendant - Appellant.

_____

O R D E R

_____

The court amends its opinion filed May 2, 2000, as follows:

On page 2, first full paragraph of opinion, lines 8, 9, and 11 -- a section mark is inserted before each section number of the U.S. Code.

On page 30, first full paragraph, line 9 -- the word "damming" is corrected to read "damning."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                             No. 98-5

AQUILIA MARCIVICCI BARNETTE,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                             No. 98-11

AQUILIA MARCIVICCI BARNETTE,
Defendant-Appellant.

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(CR-97-23-P)

Argued: September 22, 1999

Decided: May 2, 2000

Before WIDENER and NIEMEYER, Circuit Judges, and
James H. MICHAEL, Jr., Senior United States District Judge
for the Western District of Virginia, sitting by designation.

_____

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Widener wrote the opinion in which Judge Niemeyer and
Senior Judge Michael joined.

**COUNSEL**

**ARGUED:** James Patrick Cooney, III, KENNEDY, COVINGTON, LOBDELL & HICKMAN, L.L.P., Charlotte, North Carolina, for Appellant. Robert John Erickson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** George V. Laughrun, II, GOODMAN, CARR, NIXON, LAUGHRUN & LEVINE, Charlotte, North Carolina, for Appellant. Mark Calloway, United States Attorney, Robert J. Conrad, Jr., Assistant United States Attorney, Thomas G. Walker, Assistant United States Attorney, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

WIDENER, Circuit Judge:

Defendant, Aquilia Marcivicci Barnette, appeals his convictions and the district court's order sentencing him to death following his convictions. The government indicted and tried Barnette on 11 counts stemming from the murders of Donald Lee Allen and Robin Williams, three of which are punishable by the death penalty and are pertinent to this appeal: use of a firearm in a carjacking that results in death, 18 U.S.C. § 924(c), (j); commission of a carjacking that results in death, 18 U.S.C. § 2119(3); and use of a firearm while violating the Interstate Domestic Violence Act that results in death, 18 U.S.C. § 924(c), (i). After a three-week trial in January 1998, the jury found Barnette guilty of murdering both Allen and Miss Williams, and following a separate sentencing trial, the jury recommended the death sentence for those crimes, which the court imposed. Barnette presents 11 grounds for appeal before this court, alleging errors in the guilt and sentencing phases of the trial. We address each of these grounds in turn.

I.

Barnette and Miss Williams began dating in 1994. The two moved in together in Roanoke, Virginia in March 1995. A little over a year

2

later, their relationship soured, and Miss Williams broke up with Barnette in April 1996. Barnette then left the apartment they shared in Roanoke and returned to Charlotte, North Carolina, where he lived in his mother's house. The break-up was not amicable, however, and Barnette continued to attempt to resume their relationship.

Miss Williams continued to live in the apartment she had shared with Barnette, but a friend, Benjamin Greene, was staying with her because she was afraid to remain there alone. On April 30, 1996, Miss Williams woke Greene up, telling him "he was here," referring to Barnette. Greene looked out of the window and saw Barnette smashing the windows of Greene's car with a baseball bat. Greene attempted to call the police, but the telephone wires had been cut. Barnette saw Miss Williams in the apartment and began to strike at the windows with the bat. He then threw a fire bomb through a gap he had kicked open in the front door, setting the apartment on fire. Barnette fled the scene after Greene fired shots at him, and Miss Williams and Greene escaped the flames by jumping out of a rear window. Miss Williams was hospitalized with second and third degree burns to her hands and arms. Miss Williams identified Barnette to the Roanoke police, who issued a warrant for his arrest and notified the Charlotte Police Department. The Charlotte police, however, did not arrest Barnette.

On May 20, 1996, Barnette purchased a 12-gauge shotgun in Charlotte using his brother's, Mario Vonkeith Barnette's, Virginia driver's license. He returned the gun the next day and exchanged it for a semi-automatic shotgun. He sawed off the stock and barrel of the new gun and taped a flashlight to its barrel. On June 21, 1996, Barnette took the gun and walked from his mother's house to the nearby intersection of Billy Graham Parkway and Morris Field Road. Donald Allen stopped his blue Honda Prelude at that intersection shortly after midnight. Barnette approached Allen's car with the shotgun and ordered Allen to get out of the car. Allen complied and also threw down his wallet after Barnette demanded it. Barnette then forced Allen to walk at gunpoint to a drainage ditch across the road. After reaching the ditch, Barnette shot Allen three times in the back and left his body in the ditch. Barnette took Allen's wallet and car and drove to Bertha Williams', Robin Williams' mother's, house in Roanoke, Virginia. Miss Williams had been living with her mother since the firebombing incident.

3

After arriving at Mrs. Williams' house, Barnette went into the backyard and cut the home's telephone wires. He then attempted to enter the home though the side kitchen door, but after finding that it was locked, he fired the shotgun into the door and kicked it in. Mrs. Williams was inside the house holding her eight-month-old granddaughter when Barnette entered the house. Mrs. Williams told Miss Williams to run, and Miss Williams ran out the front door. Barnette entered the house, confronted Mrs. Williams, and followed Miss Williams out the front door, chasing her across the street. A neighbor, Sonji Hill, was standing in her doorway, calling the police, when Barnette ran by. Barnette saw her making the call, and from 50 feet away, he pointed the shotgun at her and told her to hang the phone up or he would shoot her. Miss Hill hung up the phone and retreated into her apartment, where she called the police again.

Miss Williams fell down as she was running away from Barnette, and he caught up with her, grabbed her by the hair, and dragged her back to her mother's house. He told Miss Williams that he planned on killing her and himself. Mrs. Williams came out of the house as they returned, and Miss Williams broke free from Barnette and went with her mother toward the house. Barnette then shot Miss Williams twice. He fired the first shot from 10 to 12 feet away, hitting Miss Williams in the side. The second shot, fired from four to five feet away, hit her in the back. When Barnette fired both shots, Mrs. Williams was close enough to her daughter to touch her. Miss Williams died from these injuries.

Barnette left the scene of the murder in Allen's car, driving to Knoxville, Tennessee where he stole new license plates for the car. He then drove to Charlotte, North Carolina where he abandoned the car in a shopping center parking lot on June 24, 1996. Police officers discovered the car that night and found the shotgun Barnette used in the murders in a nearby dumpster. Barnette turned himself in to the police on June 25, 1996 at his mother's house. After his arrest and Miranda warnings, Barnette took the police to the scene of Allen's murder and showed them where to find the body. Barnette later confessed to the two murders and the carjacking. No issue is made of the admissibility of the confession.

4

After Barnette's arrest, the United States asserted jurisdiction over the case and indicted him on 11 counts stemming from the murders and firebombing.[1] The government served its notice of consideration for the death penalty on August 7, 1997, and the guilt phase of the trial began on January 21, 1998. No witnesses at trial disputed the facts of the crimes, and the jury found Barnette guilty on all 11 counts of the indictment.

The trial then moved to the sentencing phase. The government presented two statutory aggravating factors and three non-statutory aggravating factors supporting the death sentence for Allen's murder[2] and two statutory aggravating factors and three non-statutory aggravating factors supporting imposition of the death sentence for Miss Williams' murder.[3] The government called several witnesses who tes-

_____

[1] The government charged Barnette with the following eleven crimes: Count 1, violating the Violence Against Women Act, 18 U.S.C. § 2261(a)(1), (b); Count 2, using and carrying a firearm during a crime of violence, 18 U.S.C. § 924(c)(1); Count 3, committing arson during a felony, 18 U.S.C. § 844(h); Count 4, providing false information during the acquisition of a firearm, 18 U.S.C. § 922(a)(6); Count 5, making a firearm in violation of 26 U.S.C. §§ 5861(f), 5871; Count 6, being a felon in possession of a firearm, 18 U.S.C. §§ 922(g)(1), 924(e); Count 7, committing a carjacking that results in death, 18 U.S.C. § 2119(3); Count 8, using and carrying a firearm during a carjacking that results in death, 18 U.S.C. § 924(c), (i); Count 9, transporting a stolen motor vehicle across state lines, 18 U.S.C. § 2312; Count 10, violating the Violence Against Women Act, 18 U.S.C. § 2261(a)(1), (b); and Count 11, using and carrying a firearm during the commission of a violent crime that results in death, 18 U.S.C. § 924(c)(1), (i).

[2] The statutory aggravating factors consisted of (1) committing an offense in the expectation of receiving something of pecuniary value and (2) using substantial planning and premeditation in the offense. The non-statutory aggravating factors included (1) the harm caused to Allen's family as a result of the killing, (2) the risk that Barnette would likely be a danger in the future, and (3) the existence of multiple victims in the crime.

[3] The non-statutory aggravating factors in Miss Williams' death were the same as those for Allen. The two statutory aggravating factors were (1) the creation of a grave risk of death to one or more persons in addition to the victim and (2) the use of substantial planning and premeditation in the commission of the crime.

5

tified about Barnette's past violent actions. Four members of the Allen family and three members of the Williams family also testified about the effect the killings had on them. In consideration of mitigation of punishment, the defense presented witnesses who described Barnette's difficult childhood, explained that he would do well in the structured environment of prison, and indicated he had substantial psychological problems that contributed to his violent actions. This mitigating testimony was given by 12 of Barnette's friends and family members and three experts who testified that Barnette would not be a future danger in prison. Dr. Mark Cunningham presented the most detailed testimony on future dangerousness, providing a risk assessment of Barnette and concluding that there was little likelihood Barnette would commit future violent acts in prison.

In rebuttal, the government called five more witnesses, including Dr. Scott Duncan. Dr. Duncan contested Dr. Cunningham's conclusion that Barnette would not be a future danger in prison based on three factors, the Psychopathy Checklist Revised,[4] research on predicting future dangerousness, and an actuarial analysis comparing Barnette to groups of people with characteristics similar to him. Dr. Duncan found that Barnette was likely to be violent in the future. He testified that, in his opinion, Barnette was a psychopath. Barnette then asked to recall his risk assessment expert, Dr. Cunningham, to rebut Dr. Duncan's opinion that Barnette was a psychopath, and related testimony based on the Psychopathy Checklist Revised, but the district court denied that motion.

Upon conclusion of the evidence, the jury unanimously found the existence of all the government's statutory and non-statutory aggravating factors on each of Counts 7, 8, and 11 and determined that those factors outweighed the 29 mitigating factors that at least one juror found on each of Counts 7, 8, and 11. Thus, the jury unanimously recommended the court sentence Barnette to death on the

_____

[4] The Psychopathy Checklist Revised is a diagnostic tool created by a certain Canadian Dr. Hass. It consists of a list of factors that a doctor uses to evaluate a patient. Each of these factors provides a numerical score that the doctor eventually compares to a scale. If a patient scores a certain number on the test, the doctor may conclude that the patient is a psychopath.

6

three capital counts. Prior to sentencing, Barnette made a statement to the court, after which, pursuant to 18 U.S.C. § 3594, the district court sentenced Barnette to death. Barnette now appeals his death sentence, claiming 11 errors occurred in the jury selection process, guilt phase of the trial, sentencing phase of the trial, and imposition of the death sentence.

II.

Barnette argues that the district court should not have excluded potential juror Rodney Bell for cause under the standard set forth in Witherspoon v. Illinois, 391 U.S. 510 (1968), and Wainwright v. Witt, 469 U.S. 412 (1985), because Bell's views on the death penalty did not prevent or substantially impair his ability to participate in the sentencing proceedings. In Witherspoon, the Court held that a death sentence would be invalid if the jury that found it had been chosen by excluding veniremen for cause who voiced general, conscientious, or religious objections to the death penalty. 391 U.S. at 521-22. The Court clarified the Witherspoon holding in Wainwright v. Witt, noting that the juror did not have to make it "unmistakably clear that [he] would automatically vote against imposition of capital punishment" to justify the trial judge excluding him. 469 U.S. at 419. Instead, the Court adopted the standard that the government could not challenge the juror for cause unless his views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his oath." Witt, 469 U.S. at 420 (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). In Witt, the Court stressed that a juror's answers to voir dire questions could leave the record unclear as to his opinion of the death penalty, and in these situations, the voir dire could leave the trial judge with a definite impression that the juror could not fairly consider the law. Witt, 469 U.S. at 425-26. Therefore, the Court held that the appellate court should defer to the trial judge's opinion because he was able to see and hear the juror in person. Witt, 469 U.S. at 425-26.

We leave the determination of whether a juror is substantially impaired under Witt in the first instance to the discretion of the trial judge based on the voir dire inquiry. United States v. Tipton, 90 F.3d 861, 880 (4th Cir. 1996), cert. denied, 520 U.S. 1253 (1997). Our decision in Tipton controls our review of the trial court's decision to

7

allow the prosecution to exclude Bell. There, we deferred to the discretion of the trial judge when certain jurors' answers in the voir dire inquiry were ambiguous and arguably contradictory because this inquiry turns in a large part on assessments of demeanor and credibility we cannot duplicate. 90 F.3d at 880. In the case at hand, Bell's voir dire testimony indicated that he was unclear as to his opinion on the death penalty. While Bell did state that he would try to follow the law to the best of his ability and would consider the death penalty, he also indicated that he would possibly prefer one sentencing option over the other in that "[i]f given the two choices, I would weigh heavily on not wanting to go the death penalty unless it was very, very, very, very well warranted." The trial judge had the opportunity to observe Bell and assess his answers first-hand. Under these circumstances, we believe that a conclusion that Bell's ability to perform his duties was substantially impaired was justified and that the court's decision to exclude Bell was not clearly erroneous or an abuse of discretion.

III.

Barnette also claims error in the district court's decision to allow the government to use a peremptory challenge to exclude a black juror, Stephany Jones, claiming the government excluded Miss Jones because of her race in violation of Batson v. Kentucky, 476 U.S. 79 (1986). Batson forbids a prosecutor from challenging jurors solely on account of their race. 476 U.S. at 89. A Batson challenge consists of three steps: (1) the defendant must make out a prima facie case that the peremptory challenge was based on purposeful discrimination, (2) the burden shifts to the government to produce a race neutral explanation for the peremptory challenge that is particular to the parties' case at hand, and (3) the trial court then has the duty of deciding whether the defendant has carried his burden and proved purposeful discrimination. Purkett v. Elam, 514 U.S. 765, 767-68 (1995). To satisfy the second step, the prosecution is not required to offer a persuasive or even plausible explanation for the challenge. Purkett, 514 U.S. at 768. The explanation need only be facially valid. Purkett, 514 U.S. at 768. We allow great deference to the trial judge in making the determination as to whether the proffered reason for the challenge is race neutral. See, e.g., United States v. Blotcher, 142 F.3d 728, 731 (4th Cir. 1998) (noting that court will give the district court's decision great

8

deference because based on determinations of credibility) (citing <u>Batson</u>, 476 U.S. at 98 n.21).

Assuming that Barnette made a prima facie case of exclusion on the basis of race, the prosecution offered a race-neutral explanation for the exclusion -- that Miss Jones did not favor the death penalty. We will not disturb the trial court's acceptance of that justification in this case because the record supports the conclusion that it was not pretextual. The record reveals that the juror had reservations about the death penalty, which were noted by the trial judge. Additionally, while one of the victims in this crime was white, Donald Lee Allen, the other was black, Miss Williams. The prosecution also produced many black witnesses during the sentencing phase. Finally, the parties only struck a total of three black jurors, including Miss Jones. Barnette struck one of the others and concedes that the government struck the third for legitimate reasons. Under these circumstances, we are of opinion that the patently neutral reason for striking Miss Jones was not pretextual.

IV.

Barnette claims the district court committed error in the guilt phase of his trial by failing to dismiss Counts 1, 2, 3, 10, and 11 for improper venue. The indictment describes the relevant charges as follows: Count 1 as a violation of 18 U.S.C. § 2261(a)(1), (b) for traveling across state lines and firebombing Robin Williams' apartment; Count 2 as a violation of 18 U.S.C. § 924(c)(1) for using the firebomb during a crime of violence described in 18 U.S.C. § 2261; Count 3 as a violation of 18 U.S.C. § 844(h)(1) for carrying explosive materials while violating 18 U.S.C. § 2261; Count 10 as a violation of 18 U.S.C. § 2261(a)(1), (b) for traveling across state lines and committing a crime of violence, the murder of Robin Williams; and Count 11 as a violation of 18 U.S.C. § 924(c)(1), (i)(2)(1) for using a firearm in an act of violence, the violation of 18 U.S.C. § 2261, that results in a murder as defined in 18 U.S.C. § 1111. To determine the appropriate venue for trying a crime, we must identify the conduct constituting the offense and then discuss the location of the commission of the criminal acts. <u>United States v. Rodriguez-Moreno</u>, 526 U.S. 275, 279 (1999).

9

With respect to Counts 1 and 10, the direct violations of § 2261(a)(1) of the Violence Against Women Act, Barnette argues that the Western District of Virginia is the appropriate venue because the crimes of violence and bodily injury occurred only in Roanoke, not during interstate travel or in Charlotte, North Carolina. The Violence Against Women Act creates an offense when "[a] person who travels across a State line . . . with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or intimate partner." 18 U.S.C. § 2261(a)(1) (emphasis added). The Violence Against Women Act does not contain a separate venue provision, thus we must look to the federal venue statutes. The language of § 2261(a)(1) designates a crime in which the defendant crosses state lines. Cf. United States v. Bailey, 112 F.3d 758, 766 (4th 1997), cert. denied, 522 U.S. 896 (1997). Therefore, we find that 18 U.S.C. § 3237(a) providing that "any offense . . . begun in one district and completed in another . . . may be . . . prosecuted in any district in which such offense was begun, continued, or completed" applies to these counts. Barnette began the crime in North Carolina by killing Allen and taking his car, and completed the crime by driving into Virginia and shooting Miss Williams. Thus, the offense consisted of traveling and committing a violent act. The travel occurred in both North Carolina and Virginia; therefore, venue was proper in the district courts of North Carolina.

Both Count 2 and Count 3 depend upon an underlying violent crime, the violations of the Violence Against Women Act, for their provisions to apply. The Supreme Court recently decided that "[w]here venue is appropriate for the underlying crime of violence [a kidnapping], so too it is for the § 924(c)(1) offense." Rodriguez-Moreno, 526 U.S. at 282. 18 U.S.C. § 844(h)(1) is almost identical to § 924(c)(1), it differs only in the fact that the defendant must use fire or explosive with the underlying crime. Thus, we find the Court's reasoning in Rodriguez-Moreno applies equally to determining venue for violations of § 844(h)(1), and the government may prosecute in the district where the underlying crime of violence occurred. As we have determined just above, venue for violations of § 2261(a)(1) of the Violence Against Women Act may be in a location involved in the

10

interstate travel used to commit the offense. Thus, venue for Counts 2 and 3 was also proper in the Western District of North Carolina.

Count 11 is the capital charge. Barnette argues that venue for this crime should have been in the district containing Roanoke, Virginia, where the murder took place, pursuant to the venue provision for capital murder cases in 18 U.S.C. §§ 3235-36. Section 3235 requires the government to try capital offenses in the county where the defendant committed the offense. The offense in this case, however, which the statute refers to is not the murder of Miss Williams, but a violation of 18 U.S.C. § 924(c)(1), using or carrying a firearm during or in relation to a crime of violence. This crime is a capital offense because § 924(j)(1) provides that the death penalty may be imposed if the offense results in a murder as defined in 18 U.S.C. § 1111. While the definition of murder in § 1111 applies to determine whether the crime is a capital offense, it does not define the crime Barnette was charged with. Again, the government prosecuted Barnette for a violation of § 924(c)(1), venue for which is proper in the place where the underlying crime of violence occurred. Therefore, using the same logic as with Counts 2 and 3, we are of opinion that venue was proper in the Western District of North Carolina because the underlying crime of violence involved traveling across state lines from Charlotte, North Carolina to Roanoke, Virginia.

V.

Barnette argues that the evidence does not support the guilty verdict on Counts 1, 2, 3, 10, and 11 because Barnette was not Robin Williams' "intimate partner" as defined in and required by the Violence Against Women Act. 18 U.S.C. § 2266(A) defines an "intimate partner" under § 2261(a) as a person who "has cohabited with the abuser as a spouse." No decision of a court of appeals has come to our attention which has construed the meaning of the phrase "as a spouse." The district court instructed the jury on the meaning of intimate partner in the words of the statute, leaving it to them to decide whether or not Barnette and Miss Williams lived together as spouses. As indicated by the guilty verdict on the relevant counts, the jury did find that Barnette lived with Miss Williams as an intimate partner within the words of the statute.

11

Throughout the trial, the jury heard witnesses testify about the relationship between Barnette and Miss Williams. Witnesses described Barnette as Miss Williams' boyfriend and the couple as being happy and in love when they started dating. The jurors knew that Miss Williams and Barnette had a dating relationship for a period of time before they moved in together. The witnesses also established that Barnette and Miss Williams lived together in the same apartment that Miss Williams only began renting when the two moved in together. Until that time, Miss Williams had lived with her mother. The relationship continued while they shared the apartment. A neighbor observed that during this time, Barnette drove Miss Williams' car frequently, using it to take her to, and pick her up from, work.

Other witnesses established that near the end of the relationship, Miss Williams wanted Barnette out of her apartment because they were fighting and he was too possessive, even to the point of smelling her panties to make sure she had not cheated on him. Barnette's brother indicated that their troubles began after Barnette said he found a condom and a phone number in her pocket. One witness testified that Barnette was beating Miss Williams and forcing her to have sex while they were still living together. Additionally, police officers responded to calls at the apartment when Barnette and Miss Williams were fighting because she threatened to break up with him. Mrs. Williams indicated that when her daughter did not want to live with Barnette any longer, she did not know how to force him to move out, requiring her to go to her mother's house to live on several occasions. The jury also heard testimony that after the break-up, Barnette still loved Miss Williams and was preoccupied with her. Finally, in the closing arguments, both the prosecution and Barnette argued to the jury, respectively, either that Barnette was Miss Williams' intimate partner or that the evidence did not establish that their relationship fit within the statutory definition.

All of these intimate details about the relationship between Barnette and Miss Williams were before the jury. When the word "as" is used as a preposition, as here, a standard definition is that "as" means "1. [i]n the role, capacity, or function of" and "2. [i]n a manner similar to: LIKE." See Webster's II, New Riverside University Dictionary 128 (1988). And this is the definition of "as" that we adopt in these circumstances. We are of opinion that the evidence just recited makes

12

it clear that the intimate relationship between Barnette and Miss Williams, although not husband and wife, was "like" that of husband and wife. Therefore, there was no reversible error in the district court's instructing the jury in the words of the statute.

VI.**5**

To set properly the discussion on the admissibility of the Psychopathy Checklist Revised, which follows, we must remember that the defendant objected to its use by way of a motion in limine to exclude evidence resulting from the use of the list.

Barnette claims as inadmissible Dr. Duncan's testimony relying on the Psychopathy Checklist Revised because it was not evaluated for reliability as required by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Barnette argues that the Psychopathy Checklist Revised is unreliable because it has not been standardized with respect to black inmates, and Dr. Duncan improperly used race, wealth, age, and sex to support his opinion that Barnette was a psychopath. The government contends that Daubert does not apply to the sentencing phase of a capital trial because the Supreme Court based its decision in Daubert on its interpretation of Fed. R. Evid. 702, and also that the Federal Rules of Evidence do not apply to the sentencing phase of a death penalty trial. We need not address whether Daubert applies to sentencing hearings, because, even assuming that it does, we find the evidence meets its standard for admissibility.

In Daubert, the Supreme Court radically changed the standard for admissibility of scientific testimony. Daubert, 509 U.S. at 584-89 (deciding to abandon test from Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923)). Instead of requiring that the scientific community generally accept scientific evidence before a court could admit it, the Court set out a looser, two-step gatekeeping function that a trial court must perform when evaluating the admissibility of all expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-49 (1999) (citing Daubert, 509 U.S. at 589, 593-94, 597). The trial judge must ensure that the evidence is based on scientific knowledge, or is

_____

**5** Parts VI-XII, inclusive, are related only to sentencing.

13

reliable, and ensure that the evidence will assist the trier of fact, or is relevant. <u>Daubert</u>, 509 U.S. at 592. The Court provided four factors that could be used in this evaluation, but stressed its determination that the analysis should be flexible. <u>Daubert</u>, 509 U.S. at 594. The Court also noted that "[v]igorous cross examination, presentation of contrary evidence and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert</u>, 509 U.S. at 596. The <u>Daubert</u> test's gatekeeping requirement is to ensure that the expert witness in question in the courtroom employs the same level of intellectual vigor that characterizes the practice of an expert in the relevant field. <u>Kumho Tire Co.</u>, 526 U.S. at 152. When making this determination, the trial judge must have considerable leeway in both his reliability determination and the means he uses to conduct it. <u>Kumho Tire Co.</u>, 526 U.S. at 152. We have consistently given the trial judge's decision on whether to admit expert testimony under <u>Daubert</u> great deference. See, e.g., <u>United States v. Dorsey</u>, 45 F.3d 809, 814 (4th Cir. 1995), <u>cert. denied</u>, 515 U.S. 1168 (1995). However, we must reverse if there is a clear error in judgment on the part of the district court. <u>Westberry v. Gislaved Gummi AB</u>, 178 F.3d 257, 261 (4th Cir. 1999).

While Barnette essentially alleges that the district court made an improper initial determination that the Psychopathy Checklist Revised was reliable scientific evidence, he does not contest its relevancy. When deciding whether to admit the testimony based on the Psychopathy Checklist Revised, the court considered Barnette's objections to the test, that the list had not been standardized as to the black population (Barnette is black) or as to the post middle-age population. Barnette offered two articles written by his own expert, Dr. Cunningham, to support his position, but no other evidence. On this record, the decision to admit the evidence was not a clear error of judgment. Taking into account the discretion afforded the district court's decision, we are of opinion that its examination of the issue was sufficient and that the record does not support a determination that admitting the evidence was an abuse of discretion.

Contrary to Barnette's arguments, this case is distinguishable from <u>United States v. Powers</u>, 59 F.3d 1460, 1471 (4th Cir. 1995), <u>cert. denied</u>, 516 U.S. 1077 (1996). In <u>Powers</u>, the court excluded expert testimony because the proponent of the testimony could not rebut the

14

evidence from the opponent that proved its unreliability. Powers, 59 F.3d at 1471. Here, Barnette only proffered two articles written by his expert, Dr. Cunningham, as evidence disputing the scientific validity of the Psychopathy Checklist Revised. He did not, at that time, proffer any other evidence of unreliability. In our opinion, that evidence alone is not sufficient to show unreliability when an expert in the field did rely on that type of testing. Absent evidence indicating more than such a disagreement between professionals, we do not believe the district court needed to go further to evaluate reliability.

Finally, Barnette argues that Dr. Duncan's opinion that Barnette is a psychopath rests on impermissible factors: race, age, and poverty. We find no merit in this argument. Dr. Duncan used 20 characteristics in his evaluation of Barnette under the Psychopathy Checklist Revised, in addition to the 11 characteristics he used in his future dangerousness prediction, three of which were race, age, and poverty. Barnette does not offer sufficient reasons for us to believe that Dr. Duncan's entire opinion was based only on these three factors, and not upon all the other factors combined. Additionally, Dr. Duncan utilized several other bases for his diagnosis of psychopathy and future dangerousness: the Diagnostic and Statistical Manual, Fourth Edition;[6] his observations of Barnette's behavior; the actuarial approach; and the research on predicting future dangerousness. Under these circumstances, we do not find that Dr. Duncan based his opinion on impermissible factors. That such testimony was admissible, however, does not mean that it is not subject to contradiction.

VII.

Barnette next argues that the district court erred when it instructed the jury members that if they could not agree on either a sentence of death or life imprisonment without release, the court would sentence Barnette "as provided by law up to life without the possibility of

_____

[6] The Diagnostic and Statistical Manual, Fourth Edition, is a manual produced by the American Psychiatric Association that provides doctors with a system for diagnosing mental disorders. In essence, the manual lists the symptoms or elements of various disorders, and the doctor must find a designated number of those symptoms or elements in order to diagnose a disorder.

release." Barnette proposed a jury instruction stating that if the jury could not agree upon a sentence, the court would "sentence the defendant to life without possibility of release." Barnette's proposed instruction is indistinguishable from the instruction refused by the district court in United States v. Jones, 67 U.S.L.W. 4508 (1999), which refusal was affirmed by the Supreme Court.

Were that all, we would simply affirm on the basis of Jones, but the district court did instruct the jury that in the event of disagreement as to punishment, it would sentence Barnette "as provided by law up to life without the possibility of release." That instruction given by the district court is in compliance with 18 U.S.C. §§ 3593 and 3594. The instruction proposed by Barnette, that the court, in the event of disagreement, would have been required to impose a sentence of life imprisonment without release, is simply contrary to §§ 3593 and 3594, as just mentioned.

While Jones has made it clear that the district court was not required to give any instruction to the jury as to punishment by the court in the event of disagreement, the district court did not have the benefit of that decision at the time of trial, and any procedural error made by the district court in giving the instruction that it gave is not only harmless under ordinary procedural rules, in our opinion, it is harmless beyond a reasonable doubt under Chapman v. California, 386 U.S. 18 (1967), if considered under the Eighth Amendment and the Due Process Clause.

VIII.

Barnette's next argument concerns one of the government's non-statutory aggravating factors in both murders that "[t]he defendant caused harm to the [families] of [the victims] as a result of the impact of the killing[s] on the [families]." The Federal Death Penalty Act allows victim impact evidence as a non-statutory aggravating factor. It is there described as "the effect of the offense on the victim and the victim's family." 18 U.S.C. § 3593(a) (2). The Supreme Court has also decided that presentation of victim impact evidence does not violate the Eighth Amendment. Payne v. Tennessee, 501 U.S. 808, 827 (1991). Barnette, however, claims that the use of the victim impact

16

evidence in his case was unconstitutionally vague and that its presentation violated his due process rights.

A majority of the Supreme Court declined to decide whether victim impact evidence proffered under § 3593(a) (2) was unconstitutionally vague in United States v. Jones.**7** Thus, Barnette argues that the proper standard for review of aggravating factors is for vagueness. While Tuilaepa v. California, 512 U.S. 967 (1994), does recognize different standards, concerning guilt or punishment, for evaluating selection and eligibility aggravating factors,**8** the Court also recognized that "the objectives of these two inquiries can be in some tension" and that "the proper degrees of definition of eligibility and selection factors often is not susceptible of mathematical precision." 512 U.S. at 973 (internal citations and quotations omitted). Therefore, the Court found that the controlling principle in analyzing aggravating factors for vagueness is to ensure that they do not infect the death sentence with bias or caprice. Tuilaepa, 512 U.S. at 973. Additionally, the Court found that the "vagueness review is quite deferential" and "a factor is not unconstitutional if it has some common sense core of meaning . . . that criminal juries should be capable of understanding." Tuilaepa, 512 U.S. at 973, 975 (quoting Jurek v. Texas, 428 U.S. 262, 279 (1976) (White, J., concurring in judgment)) (internal quotations omitted).

Using the deferential standard of review and examining the proceedings for bias and caprice, we find that the victim impact aggravat-

_____

**7** Only four justices in Jones  agreed that the victim impact evidence was not unconstitutionally vague. Jones, 67 U.S.L.W. 4508, 4514-16 (plurality opinion) (Thomas, J.; Rehnquist, C.J.; O'Connor, J.; and Kennedy, J.). Justice Scalia did not provide an opinion on this question, instead he joined in the portion of the opinion deciding that although the factors were "loosely drafted," their use constituted harmless error. Jones, 67 U.S.L.W. at 4516.

**8** Addressing the differences in these factors is beyond the scope of this opinion. For an analysis of the factors, see Tuilaepa, 512 U.S. at 971-975. We note here that the victim impact evidence may go both to the definition of the crime and to the sentencing. See Tuilaepa, 512 U.S. at 972. But in the case at hand, none of the evidence on the effect on the victims' families was introduced until the sentencing phase of the trial.

17

ing factor in this case had a common sense core of meaning. The jury knew it was to consider the impact on the families that resulted from the deaths of Allen and Miss Williams from the language of the factor alone. In these circumstances, we do not find that the victim impact aggravating factor was unconstitutionally vague as applied in Barnette's case.

While the jury may consider victim impact aggravating factors, the evidence used to establish it may so infect the trial that it constitutes a due process violation. See Payne, 501 U.S. at 825. To violate due process, an error must be of sufficient significance that it denies the defendant the right to a fair trial. Greer v. Miller, 483 U.S. 756, 765 (1987). No case has come to our attention in which this court or the Supreme Court has vacated a sentence because victim impact evidence violated the limits of due process.

The prosecution presented 23 witnesses during the sentencing phase. Seven of these witnesses were members of the victims' families testifying about the impact the crime had on their lives. These witnesses presented stories of the victims' childhoods, family experiences, and the trauma of their deaths, and poems reflecting their deep sadness and regret over their losses. While such evidence does have a substantial impact, we must evaluate it in the context of the entire sentencing hearing. Of the remaining 16 witnesses, 11 witnesses, including many of Barnette's old girlfriends, presented testimony to the jury accusing Barnette of rape, beatings, and abuse. In mitigation, Barnette presented a total of 23 witnesses, including ten of his own family members. This evidence revealed that Barnette's sad and difficult childhood affected his view of the world and women.

In this context, we cannot say that the victim impact evidence denied the defendant a fair trial. The testimony of the victims' families was only a small portion, approximately 83 pages or 22%, of the prosecution's total of 271 pages of its case in aggravation that included approximately 160 pages of testimony about Barnette's violent history. Barnette had ample opportunity to counter this testimony; his family alone testified for approximately 194 pages, or 41%, of a total of 471 pages in his case in mitigation. Even if the victim impact evidence went beyond the "quick glimpses of the life" of the victim mentioned in Payne, 501 U.S. at 522, on the whole it did not contami-

18

nate the proceeding. <u>Payne</u> does not similarly limit the presentation of evidence on the impact of the crime upon the family. See <u>Payne</u>, 501 U.S. at 822. Additionally, we note that in <u>United States v. McVeigh</u>, the court allowed 38 witnesses to testify in support of the victim impact non-statutory aggravating factor at the penalty phase. 153 F.3d 1166, 1216, 1221-22 (10th Cir. 1998), <u>cert. denied</u>, 526 U.S. 1007 (1999). This testimony was poignant and emotional, covering topics such as last contacts with the victims and the "pure love and innocence of the children killed." <u>McVeigh</u>, 153 F.3d at 1217-18, 1221-22. The court affirmed, finding that the verdict was not based on passion rather than reason and that the decision of the jury was based on a reasoned moral judgment. We make those same findings here.

IX.

Barnette alleges that the district court committed error by submitting to the jury the statutory aggravating factor that Barnette created a grave risk to others during the murder of Robin Williams. Barnette argues this instruction was unconstitutionally vague and the evidence presented did not support that factor. The Federal Death Penalty Act allows the jury to consider that the "defendant, in the commission of the offense, or in escaping . . . knowingly created a grave risk of death to 1 or more persons in addition to the victim of the offense" as a statutory aggravating factor. 18 U.S.C. § 3592(c)(5). While courts have interpreted state statutory versions of this aggravating factor, very few federal courts have interpreted or applied this provision of the Federal Death Penalty Act. Interpretations of state laws are not binding upon our construction of a federal statute. We use the standard for evaluating aggravating factors for vagueness from <u>Tuilaepa</u> and look to see that the factor had a common sense core of meaning that the jury could understand. 512 U.S. at 973-75.

While a plurality of the Supreme Court has acknowledged that this aggravating factor may be unconstitutionally vague, depending on the facts, <u>Gregg v. Georgia</u>, 428 U.S. 153, 202 (1975), when the Court evaluated these factors, it looked to the underlying Georgia courts' interpretations of the factors and found that they were not vague as applied. See <u>Gregg</u>, 428 U.S. at 202; <u>Proffitt v. Florida</u>, 428 U.S. 242, 256 (1975). The only federal courts that have examined this aggravat-

19

ing factor did so in a pretrial context. The first evaluated § 3592(c)(5)'s predecessor, 21 U.S.C. § 848(n)(5), and determined that if the government could prove that the defendant threatened bystanders at gunpoint, the jury could consider the aggravating factor of grave risk to others. United States v. Walker, 910 F. Supp. 837, 849-50 (N.D.N.Y. 1995). In United States v. McVeigh, the court considered the current provision in the Federal Death Penalty Act and concluded that when read in the context of the factual allegations of the crimes, the factor was not vague. 944 F. Supp. 1478, 1490 (D. Colo. 1996).[9]

The district court clarified the meaning of grave risk of death in the jury instructions, defining it as "a significant and considerable possibility" and as placing other persons in a "zone of danger." This definition does not differ from the plain meaning of the statute, and we are of opinion that the instruction was not overly broad and provided a common sense core of understanding to the factor that the jurors could understand. As in McVeigh, the facts of this case reveal that the government showed that Barnette created a grave risk of death both to Sonji Hill and to Bertha Williams.

The evidence shows that Barnette aimed his shotgun at Miss Hill when she was standing 50 feet away and threatened to shoot her. Not only was Miss Hill in the target zone of Barnette's conduct at that time, she was the target. Bertha Williams was standing an arm's length away from her daughter when Barnette shot Miss Williams from 10 to 12 feet away. Because Barnette's shot came close enough to Bertha Williams that any small error in aim could have wounded or killed her in addition to her daughter, Mrs. Williams was easily in Barnette's target zone. Under these circumstances, this aggravating factor was not vague, and the jury had sufficient evidence to conclude that Barnette placed both of these women at a grave risk of death.

_____

**9** McVeigh involved the prosecution for the bombing of the Murrah Building in Oklahoma City, Oklahoma. The bomb caused the building to collapse, and the court considered the force of the explosion could have created a risk to those not physically affected by the explosion. McVeigh, 944 F. Supp. at 1490. The court did, however, recommend a clarifying instruction. McVeigh, 944 F. Supp. at 1490.

20

X.

At the end of his sentencing trial, Barnette requested that he be permitted allocution to the jury before they retired to deliberate his sentence. The district court denied his request, and Barnette contends that this denial violated his statutory and Constitutional right to allocution. The Supreme Court has not addressed the constitutionality of a defendant's right to allocution. See McGautha v. California, 402 U.S. 183, 218 n.22 (1971) (citing Hill v. United States, 368 U.S. 424, 429 (1961)) (noting that the Court has not addressed the issue of whether a court's refusal to allow a defendant to allocute is a Constitutional violation), vacated sub nom. Crampton v. Ohio, 408 U.S. 941 (1972). Barnette relies on Federal Rule of Criminal Procedure 32(c)(3)(C) and our decision in Ashe v. North Carolina, 586 F.2d 334 (4th Cir. 1978), cert. denied, 441 U.S. 966 (1979), as the bases for his claim. Rule 32(c)(3)(C) states that "before imposing sentence, the court must . . . address the defendant personally and ask the defendant if the defendant wishes to make a statement." In Ashe, we held that the denial of a defendant's request to allocute to the state sentencing court was a denial of due process. 586 F.2d at 336. However, neither Rule 32 nor Ashe answer the question of whether a defendant has a right to address members of the jury, as opposed to the sentencing judge, before they retire to determine the sentence.

Recently, in Green v. French, 143 F.3d 865 (4th Cir. 1998), cert. denied, 525 U.S. 1090 (1999), we had the occasion to evaluate the application of Ashe to a defendant's request to allocute before a sentencing jury, as distinguished from the sentencing court, in a North Carolina capital murder case. Because Green was a habeas appeal, we found that despite Ashe, the district court did not err according to clearly established federal law when it denied the defendant the right to allocute to the jury. Green, 143 F.3d at 877. Because the defendant in Ashe requested allocution before a sentencing court judge, not a jury, we found that the lower court's determination that the defendant did not have a right to allocute before the jury did not contradict our holding in Ashe. Green, 143 F.3d at 882-84.

A case directly on point is United States v. Hall, 152 F.3d 381 (5th Cir. 1988), cert. denied, 67 U.S.L.W. 3706 (1999). In that case, the point on appeal was whether or not the criminal defendant had a Con-

21

stitutional right to make an unsworn statement of remorse before the jury which was not subject to cross examination. The court held that he did not, and we follow that case. Hall, 152 F.3d at 396. Neither are we of opinion that Rule 32 has such a requirement.

XI.

Barnette alleges that the death sentence in his case violates 18 U.S.C. § 3595(c)(2)(A) because it was imposed under the influence of passion, prejudice, or arbitrariness. We have found little guidance on how to interpret this provision of the Federal Death Penalty Act. Only two Fifth Circuit cases have evaluated cases under § 3595(c)(2)(A). See United States v. Webster, 162 F.3d 308 (5th Cir. 1998), cert. denied, 68 U.S.L.W. 3224 (1999); United States v. Hall, 152 F.3d 381 (5th Cir. 1998), cert. denied, 67 U.S.L.W. 3706 (1999). From these cases and our own reading of the statute, we look to the record to see if these factors motivated the jury's recommendation of the death penalty, including an analysis of the aggravating factors to see if the jury had an abundance of evidence to support imposition of the death penalty. See Hall, 152 F.3d at 426; Webster, 162 F.3d at 354. Barnette argues that we consider the following claimed errors in addition to the 11 grounds raised in this appeal: the court's failure to allow Barnette to admit his confession at trial; one witness's testimony that the defendant was a "cold hearted motherfucker;" the prosecutor calling Dr. Cunningham a liar in his closing; the prosecution's use of evidence that Barnette raped Alesha Chambers when he was not convicted of that crime; the prosecution's use of witnesses testifying that Barnette sexually harassed other women; the prosecutor stressing the jury's duty during his closing; the prosecution's mention of God's justice during the closing; and alleged contradictions in the jury's findings that indicate they should not have issued the death penalty.

Upon review of the record, we do not find that the jury imposed the death penalty under improper influence. There is no indication that the jury did not weigh the evidence, and it had sufficient evidence to reach its particular findings on the aggravating factors, even if the defense is correct that the above allegations were errors, which we do not hold. We recognize that while the proceedings must be free from passion, prejudice, and other arbitrary factors, a death penalty case

22

will not be emotionless. The errors alleged by the defense did not rise to a level that overwhelmed the proceedings and created an improper basis for the verdict.

XII.

Finally, Barnette alleges that the district court erred when it refused to allow Dr. Mark Cunningham to testify in surrebuttal to contest Dr. Scott Duncan's diagnosis of Barnette as a psychopath which was presented by the government in rebuttal.

A.

First, we must determine whether it was an error for the district court to exclude Dr. Cunningham as a witness in surrebuttal for the defense. Surrebuttal evidence is admissible to respond to any new matter brought up on rebuttal. United States v. King, 879 F.2d 137, 138 (4th Cir. 1989), cert. denied, 493 U.S. 900 (1989) (citing United States v. Burgess, 691 F.2d 1146 (4th Cir. 1982)). If the evidence would be repetitive of prior testimony, we leave the decision to admit surrebuttal testimony to the sound discretion of the trial judge. Burgess, 691 F.2d at 1151-52. In United States v. King, we held that the district court erred when it denied the defendant the opportunity to present surrebuttal evidence to rebut an "obviously [ ] new matter." 879 F.2d at 138.

Before Dr. Duncan took the stand, Barnette had presented in response to the government's case in chief three psychological or psychiatric experts[10] during his case in mitigation: Dr. Faye Sultan, Dr. Seymore Halleck, and Dr. Cunningham. Dr. Sultan used the Diagnostic and Statistical Manual, Fourth Edition, to diagnose Barnette with depression and borderline personality disorder. Dr. Halleck also provided a detailed diagnosis from the Diagnostic and Statistical Manual,

_____

[10] The defense also called one other psychiatrist, Dr. Sally Johnson. Dr. Johnson was the forensic psychiatrist at the prison where the government held Barnette pending trial. She testified that Barnette had performed so satisfactorily in prison that she felt safe to move him into the general prison population. Dr. Johnson, however, did not testify as to Barnette's mental health.

23

Fourth Edition, finding that Barnette suffered from substance abuse, depression, bipolar disorder, intermittent explosive disorder, and borderline personality disorder. Finally, Dr. Cunningham, a psychologist and risk assessment expert, testified about the risk of Barnette committing further violent acts in prison. After explaining his methods and the statistical bases behind his opinion, he found that Barnette's risk for future violence in prison was very low. Dr. Cunningham was Barnette's last witness prior to the government's case in rebuttal.

Before the government began its case in rebuttal, Barnette moved to bar Dr. Duncan's anticipated testimony based on the Psychopathy Checklist Revised. The trial court denied that motion. Barnette asked to have Dr. Cunningham in the courtroom during Dr. Duncan's testimony in order for him to prepare for surrebuttal. The court also denied this motion. Dr. Duncan then testified in rebuttal for the government on the issue of whether Barnette would be a future danger if placed in prison for life. Dr. Duncan testified that Barnette was a psychopath, basing his opinion on the Diagnostic and Statistical Manual, Fourth Edition, the Psychopathy Checklist Revised, and his observations of Barnette's behavior. <u>Despite all the psychological testimony in the case of whatever type, until the government called Dr. Duncan to the stand, there was no diagnosis of Barnette as a psychopath</u>.

To repeat, until the government introduced Dr. Duncan as its witness on rebuttal in this case, no diagnosis of Barnette as a psychopath had entered the proceeding. Indeed the word had never been mentioned. Certainly, if Dr. Duncan's testimony was admissible in rebuttal, it was admissible in the government's sentencing case in chief to show that the defendant would not be accommodated by life imprisonment. When the district court held that Barnette could not introduce the only evidence he had to contradict the evidence of Dr. Duncan, it abused whatever discretion it may have had and committed reversible error, as we will demonstrate below.

While Dr. Duncan was not a psychiatrist, he was an expert in forensic psychology. His testimony was not brief or fleeting, instead he provided 72 pages of testimony in exquisite detail, and we set forth the substance of that testimony as follows.

24

Q. Let me turn your attention back to the conclusion you drew that the defendant was a psychopath based upon the PCL-R?

. . .

Q. Before you tell us how you came to that conclusion, will you describe for the jury what a psychopath is?

A. Certainly. In general, a psychopath is an individual who lacks the ability to feel at the same level and have the intensity of what feelings are as compared to nonpsychopathic individuals. Typically they are very callous, manipulative, calculating, individuals that will often exploit other people. There is research to suggest that biologically, they do not respond to what nonpsychopaths view as fear and anxiety which are two emotions that make up what we refer to as remorse or guilt. The pyschopath is an individual that has little if any ability to feel remorse or guilt for behavior they engage in.

Q. Now, did you come to the conclusion in your report and as you testified today that the defendant is a psychopath?

A. That was based on the behavior that we saw during our interviews of the defendant, also based on a review of the material that I had cited earlier and based on how he eventually scored on the Hare Psychopathy Checklist Revised.

Q. Is psychopathy a formal diagnosis?

A. No, sir, it is not a diagnosis formally listed in the DSM-4.

Q. Why is it important to establish whether or not a defendant is a psychopath?

25

A. Well, psychopaths are -- criminal psychopaths are twice as likely to engage in future criminal behavior when compared to noncriminal psychopaths. Criminal psychopaths are three times as likely to engage in violent future criminal behavior when compared to nonpsychopathic criminals. Although in any prison population only about 20 percent of that population typically are psychopaths, they are responsible for over 50 percent of violent crimes that are committed. Also, identifying someone as a psychopath helps institutions to be able to place them either in a maximum or lower security penitentiary based on what they score out.

. . .

Q. Now, do psychopaths look any different than other people?

A. No, sir. The psychopath, probably one of their best assets and probably one of the greatest fears of nonpsychopaths is their ability to look normal. We would all like to be able to think that we can pick out the psychopaths from the nonpsychopaths in the community, but none of us are immune to that. . . .

The psychopath, as I say, has the ability to look very normal. However, if you know what you are looking for, it is kind of like seeing a bowel [sic] of fruit, and you say to yourself, gosh that bowl of fruit looks wonderful, it looks very good. But when you get close to the bowel [sic] of fruit and pick it up you realize that it's fake fruit. And the psychopath is a lot that way. And they look very, very normal, but when you know what to look for, you can see things in their behavior, not their appearance necessarily as much as things in their behavior, which identify them as psychopaths.

After combining the psychopathy diagnosis with an actuarial analysis of prisoners similar to Barnette and with conclusions from research concerning predictions of future dangerousness, Dr. Duncan concluded that Barnette would be a future risk in prison.

26

On cross examination, Barnette's attorney examined Dr. Duncan's use of the Psychopathy Checklist Revised in his assessment of Barnette. First, Barnette's attorney noted that no other experts in the trial had used that form for diagnosis. He then questioned Dr. Duncan extensively about an article criticizing use of the Psychopathy Checklist Revised with black populations and mandating that doctors use it with caution when evaluating those populations.

At the conclusion of Dr. Duncan's testimony, Barnette moved to recall Dr. Cunningham to testify in surrebuttal to Dr. Duncan's psychopathy testimony. The government objected on the grounds that the defense should have presented their evidence concerning the psychopathy diagnosis and use of the Psychopathy Checklist Revised during the testimony of their expert witnesses. Barnette countered by arguing that he had a right to rebut the evidence Dr. Duncan presented and that his witness would critique the Psychopathy Checklist Revised as invalid, irresponsible science. The court denied the motion, finding that Barnette's attorney had cross examined Dr. Duncan on the validity of the Psychopathy Checklist Revised using an article criticizing the Psychopathy Checklist Revised and concluding that Barnette had nothing additional to contribute. Barnette then proffered the testimony Dr. Cunningham would have provided on surrebuttal, including: the invalidity of the Psychopathy Checklist Revised as applied to blacks; the inappropriateness of the use of the test on Barnette; Dr. Cunningham's own application of the Psychopathy Checklist Revised to Barnette, including a different score on the test that would not qualify Barnette as a psychopath; Dr. Cunningham's opinion that Barnette was not a psychopath; and his knowledge of no other studies addressing the validity of the Psychopathy Checklist Revised's application to the black population, other than the one the defense had already introduced.

We are of opinion that the testimony the defense sought to introduce in surrebuttal was not cumulative or repetitive. Despite Barnette's attorney's cross examination of Dr. Duncan on the validity of Dr. Duncan's technique, questions from an attorney are not nearly so effective as the testimony of a qualified expert witness. And this must be especially true when, as here, the subject is the highly technical and specialized subject of the condition of a man's mind. Additionally, Dr. Cunningham would have testified about the fact that he

27

scored Barnette differently with the Psychopathy Checklist Revised and about his own diagnostic finding that Barnette was not a psychopath. On this record, simple fairness required that Barnette have the ability to rebut the new evidence the government's expert introduced in rebuttal. See King, 879 F.2d at 138.

B.

While it was error for the court to refuse to allow Dr. Cunningham to testify in surrebuttal, we cannot reverse a sentence of death "on account of any error which can be harmless . . . where the Government establishes beyond a reasonable doubt the error was harmless." 18 U.S.C. § 3595(c)(2); see United States v. Jones, 67 U.S.L.W. 4508, 4516 (1999) (using § 3595(2) standard for harmless error to evaluate error caused by loosely drafted aggravating factors). Section 3595(2) incorporates the same standard for harmless error review as that used to evaluate direct appeals of Constitutional errors. See, e.g., Chapman v. California, 386 U.S. 18, 23-24 (1967). We use a different standard, considering whether the exclusion had a substantial or injurious effect on the jury's selection of the death sentence, in review of trial-type Constitutional error in review of habeas cases. See Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).

To evaluate the harmlessness of this error, we look to cases addressing the importance of psychological testimony. In Satterwhite v. Texas, the Supreme Court found that the introduction of inadmissible psychiatric testimony that the defendant would be a future danger was not harmless beyond a reasonable doubt. 486 U.S. 249, 258 (1988). The Court reached this determination after noting that the doctor who testified was the only specialist in psychiatry to take the stand and provide this type of testimony. Satterwhite, 486 U.S. at 259. Other witnesses had testified about the defendant's violent tendencies, but not with the impact of a medical expert. Satterwhite, 486 U.S. at 259. Additionally, the Court noted that the doctor stressed that the defendant had no conscience and was a sociopath beyond the reach of rehabilitation and that the prosecution called attention to the doctor's conclusions in his closing arguments. Satterwhite, 486 U.S. at 259-60.

In Ake v. Oklahoma, the Court found that because psychiatric evidence was so important, a defendant has a Constitutional right to a

28

government-provided doctor if his mental state will be a significant factor at trial. 470 U.S. 68, 83 (1985). While the Court did not engage in a harmless error analysis, it did note that having two views on a mental health issue ensures both that the defendant receives a fair adjudication of the case and that the jury does not erroneously impose any punishment. Ake, 470 U.S. at 83-84. The Court also noted in such cases its own reliance on the assumption that it had before it "both the views of the prosecutor's psychiatrists and the`opposing views of the defendant's doctors.'" Ake, 470 U.S. at 84. Barnette, in the case at hand, was deprived of the "opposing views of the defendant's doctors."

In United States v. MacClosky, we found that excluding key evidence, which was psychiatric evidence, was not harmless error when the witness would have offered detailed testimony vital to the defense's ability to explain the damaging testimony. 682 F.2d 468, 479 (4th Cir. 1982). In two other cases, we evaluated the exclusion of psychiatric evidence under the lesser harmless error standard on habeas review. In Boyd v. French, the defendant wanted to introduce expert testimony that his childhood and history of personal loss made him more likely to kill a family member. 147 F.3d 319, 326-27 (4th Cir. 1998), cert. denied, 525 U.S. 1150 (1999). But, in the context of a crime involving indisputable premeditation, we concluded that the error was harmless because the court did not consider that the jury would have been substantially influenced by the excluded testimony. Boyd, 147 F.3d at 328. In Tuggle v. Netherland, we found that the erroneous exclusion of psychiatric expert testimony showing the defendant would not be a danger in the future was harmless error because the excluded evidence did not have a substantial or injurious effect or influence. 79 F.3d 1386, 1393, 1395, 1396 (4th Cir. 1996), cert. denied, 519 U.S. 894 (1996). However, we reached that determination in Tuggle while using the lesser standard for harmless error review, and in arriving at our conclusion, we considered that the record was unimpeachable as to the jury finding of vileness, which also supported a sentence of death.[11]

---

[11] In Virginia, the jury need only find one valid aggravating factor, and so long as the invalid factor did not influence the valid factor, any error is harmless. Tuggle, 79 F.3d at 1393. We found that the future dangerousness issue did not relate to or rebut the remaining valid finding of vileness and upheld the death sentence. Tuggle, 79 F.3d at 1395-96.

29

After an analysis of the record and authorities, we are of opinion that the failure to allow Dr. Cunningham to testify in surrebuttal as to the psychopathy evidence was not harmless error and requires a new sentencing hearing. As the Supreme Court has acknowledged, psychiatric evidence is an important part of many trials, like this one. Ake, 470 U.S. at 83. Additionally, the Court has recognized the principle that leaving this testimony unanswered can have a devastating effect on a defendant. Ake, 470 U.S. at 84. In the case at hand, the testimony of Dr. Duncan was as damning as it could be. By excluding Dr. Cunningham's testimony, the district court left the jury with the unrebutted expert opinion that Barnette was a psychopath who felt no remorse or guilt, and that he resembled a fake bowl of fruit. Only by cross examination was Barnette able to cast any doubt on this testimony by questioning Dr. Duncan on the validity of his methods. In such a case, cross examination is poor substitution for a live expert witness. The defense was excluded from the testimony of its expert to counter Dr. Duncan's opinions.

Again, the record shows that Dr. Duncan's analysis in rebuttal, for the first time in the case, introduced the diagnosis of Barnette as a psychopath. Barnette should have had the opportunity to introduce "the opposing views of the defendant's doctor[ ]." Ake, 47 U.S. at 84. We thus conclude that there is a reasonable possibility that the exclusion of the evidence of Dr. Cunningham might have contributed to the sentence of death and that the government has not established beyond a reasonable doubt that the error in excluding such evidence was harmless beyond a reasonable doubt. 18 U.S.C. § 3595(c)(2), Chapman v. California, 386 U.S. 18, 24 (1966).

XIII.

In summary, the conviction of Barnette, as distinguished from his sentence, is, in all respects, affirmed.

The sentence of death of Barnette is vacated, and the case is remanded for a new sentencing hearing, because of the exclusion of the testimony of Dr. Cunningham, as mentioned in this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED

30